# In the
# United States Court of Appeals
## for the Sixth Circuit

DERIC JAMES LOSTUTTER; ROBERT CALVIN LANGDON;
BONIFACIO R. ALEMAN,

*Plaintiffs-Appellants,*

v.

COMMONWEALTH OF KENTUCKY,

*Defendant,*

ANDREW G. BESHEAR, in his official capacity as Governor of Kentucky,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Eastern District of Kentucky at London, No. 6:18-cv-00277.
The Honorable **Karen K. Caldwell**, Judge Presiding.

## PLAINTIFFS-APPELLANTS' PETITION FOR REHEARING AND REHEARING EN BANC

BEN CARTER
KENTUCKY EQUAL JUSTICE
CENTER
222 S. First St., Suite 305
Louisville, KY 40202
(502) 303-4062

JON SHERMAN
MICHELLE KANTER COHEN
FAIR ELECTIONS CENTER
1825 K St. NW, Suite 450
Washington, DC 20006
(202) 331-0114

*Counsel for Plaintiffs-Appellants*
*Deric James Lostutter, Robert Calvin Langdon, and Bonifacio R. Aleman*




# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................... ii

INTRODUCTION ............................................................................................1

ARGUMENT ....................................................................................................2

    I.     THE PANEL'S DECISION CONFLICTS WITH PRECEDENTS
         OF THE U.S. SUPREME COURT AND THIS COURT ....................2

       A.    PLAINTIFFS' CLAIMS .............................................................2

       B.    THE PANEL DECISION'S FORMALISM ..............................5

       C.    THE PANEL DECISION'S COMPARISON OF VOTING
           RIGHTS RESTORATION AND LICENSING ......................12

    II.    THIS APPEAL PRESENTS A QUESTION OF EXCEPTIONAL
         PUBLIC IMPORTANCE ...................................................................16

CONCLUSION ...............................................................................................17

RULE 32(g) CERTIFICATE .........................................................................18

CERTIFICATE OF SERVICE .......................................................................19

EXHIBIT A:  Opinion, Filed July 20, 2023

EXHIBIT B:  Transcription of Audio Recording, Oral Argument,
               Dated June 22, 2023

# TABLE OF AUTHORITIES

**CASES**                                                               **Page(s)**

*Bantam Books, Inc. v. Sullivan*,
    372 U.S. 58 (1963) ........................................................................ 8

*Bigelow v. Virginia*,
    421 U.S. 809 (1975) ...................................................................... 8

*Branti v. Finkel*,
    445 U.S. 507 (1980) ...................................................................... 8

*City of Lakewood v. Plain Dealer Publishing Co.*,
    486 U.S. 750 (1988) .......................................... 2, 3, 4, 5, 13, 14

*Fletcher v. Graham*,
    192 S.W.3d 350 (Ky. 2006) ........................................................ 12

*Forsyth County v. Nationalist Movement*,
    505 U.S. 123 (1992) ...................................................................... 2

*FW/PBS, Inc. v. City of Dallas*,
    493 U.S. 215 (1990) ...................................................................... 3

*Garcetti v. Ceballos*,
    547 U.S. 410 (2006) ...................................................................... 7

*Gautreaux v. Chicago Hous. Auth.*,
    178 F.3d 951 (7th Cir. 1999) ...................................................... 11

*In re Rizzo*,
    741 F.3d 703 (6th Cir. 2014) ...................................................... 10

*Lebron v. Nat'l R.R. Passenger Corp.*,
    513 U.S. 374 (1995) ...................................................................... 8

*Lovell v. Griffin*,
    303 U.S. 444 (1938) ...................................................................... 3

*Martinez v. Carnival Corp.*,
    744 F.3d 1240 (11th Cir. 2014) .................................................. 11

*Nat'l Ass'n for Advancement of Colored People v. Button*,
    371 U.S. 415 (1963) ...................................................................... 8

*Novak v. City of Parma*,
    932 F.3d 421 (6th Cir. 2019) ................................................................ 11, 17

*Ostergren v. Frick*,
    856 F. App'x 562 (6th Cir. 2021) ........................................................ 11

*Press-Enter. Co. v. Superior Ct. of California for Riverside Cnty.*,
    478 U.S. 1 (1986) ...................................................................................... 7

*Quackenbush v. Allstate Insurance Co.*,
    517 U.S. 706 (1996) ................................................................................ 10

*Vogel v. U.S. Office Products Co.*,
    258 F.3d 509 (6th Cir. 2001) ............................................................ 9, 10

*Whitney v. City of Milan*,
    677 F.3d 292 (6th Cir. 2012) .............................................................. 11

## CONSTITUTIONS

U.S. Const., amend. I ............................................................... *passim*

Ky. Const. § 145 .............................................................................. 6

## STATUTES

Ky. Rev. Stat. § 119.025 ................................................................ 6

Ky. Rev. Stat. § 196.045 .......................................................... 5, 6

Ky. Rev. Stat. § 532.020 ................................................................ 6

## OTHER AUTHORITIES

U.S. Dep't of Justice, *Probation and Parole in the United States*
    (2020), *available at* https://bjs.ojp.gov/content/pub/pdf/ppus20.pdf ............ 16

U.S. Dep't of Justice, *Probation and Parole in the United States* (2021),
    *available at* https://bjs.ojp.gov/sites/g/files/xyckuh236/files/media/
    document/ppus21.pdf ...................................................................... 16

**INTRODUCTION**

Plaintiffs-Appellants petition this Court for rehearing and rehearing en banc because the panel's decision (Ex. A) conflicts with decades of U.S. Supreme Court precedents concerning the First Amendment, as well as decisions of the Supreme Court and this Court establishing the requirements of a functional analysis. This appeal also raises questions of exceptional public importance.

Appellants sued the Governor of Kentucky to put an end to arbitrary restoration of voting rights, which puts U.S. citizens' right to express their political views at the mercy of a public official's unfettered discretion. The U.S. Supreme Court has long forbidden the arbitrary licensing of First Amendment-protected politically expressive conduct, which includes voting. Arbitrarily granting people the right to vote would indisputably violate the U.S. Constitution, as would arbitrarily disenfranchising them. Appellants have sought a parallel ruling that arbitrary re-enfranchisement is similarly unconstitutional.

The panel has ruled that the First Amendment unfettered discretion doctrine is not implicated by this case because voting rights restoration does not function as a licensing scheme. In reaching this determination, the panel formalistically relied upon the labels assigned to voting rights restoration under Kentucky law and thereby allowed state law categories to dictate the scope of a federal constitutional right. Respectfully, this threshold error led the panel to base its ultimate ruling on

perceived functional dissimilarities between "pardons" and "licenses," even though these purported differences had no material bearing on the First Amendment inquiry. In privileging means over ends and elevating the *form* of official action and state-created labels over the commonality in *practical effects*, the panel's decision conflicts with longstanding precedents commanding a functional analysis in First Amendment challenges.

## ARGUMENT

## I. THE PANEL'S DECISION CONFLICTS WITH PRECEDENTS OF THE U.S. SUPREME COURT AND THIS COURT.

### A. PLAINTIFFS' CLAIMS

Plaintiffs have argued that Kentucky's voting rights restoration system functions as a licensing system governing First Amendment-protected conduct, triggering the operation of the unfettered discretion doctrine under *City of Lakewood v. Plain Dealer Publishing Co.*, 486 U.S. 750 (1988), *Forsyth County v. Nationalist Movement*, 505 U.S. 123 (1992), and related Supreme Court precedents. This prophylactic doctrine instructs courts to enjoin licensing schemes governing the exercise of First Amendment-protected expression or expressive conduct where officials have been vested with unfettered discretion to grant or deny the license. *City of Lakewood*, 486 U.S. at 757, 763–64. A lack of reasonable definite time limits

on the exercise of the licensor's discretion also violates the First Amendment. *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 226 (1990).[1]

Under such an arbitrary licensing system, the applicant is subjected to the risk of "undetectable" viewpoint or speaker-based discrimination and pressured into self-censorship so as not to jeopardize their application. *City of Lakewood*, 486 U.S. at 759, 762–63. "[A] facial challenge lies whenever a licensing law gives a government official or agency substantial power to discriminate based on the content or viewpoint of speech by suppressing disfavored speech or disliked speakers." *Id.* at 759. The Supreme Court has also explained that in the absence of "standards to fetter the licensor's discretion," as-applied challenges are not viable, and the licensor's decision is "effectively unreviewable." *Id.* at 758–59.

This case implicates all the same concerns and principles that have animated the unfettered discretion doctrine for eighty-five years. *Lovell v. Griffin*, 303 U.S. 444 (1938). No rules or criteria govern Appellee's decision to grant or deny a voting rights restoration application. Application for Restoration of Civil Rights, RE 57-1, Page ID # 786–88; Appellants' Br. at 6–7, 28. According to his counsel, Governor Beshear grants or withholds permission to vote based on whether he considers the applicant "worthy." *See* Ex. B, Transcript of Oral Argument ("Oral Arg. Tr.") at

---

[1] Plaintiffs' Counts One and Two seek relief under these two closely related doctrines. Fourth Amended Complaint, RE 31, Page ID # 350–57.

22:17–23:10 ("Under Kentucky law, that is left to each governor who holds the office to ultimately subjectively determine what – who they think is worthy . . ."). Deciding whether to grant or deny an application to engage in First Amendment-protected expressive conduct based on a wholly subjective and arbitrary "worthiness" standard is precisely what the First Amendment unfettered discretion doctrine prohibits. Under Kentucky's purely discretionary system, a governor may review any information on the applicant's political viewpoints, including campaign donations, previous registration history, and social media posts, and selectively grant or deny applicants based on their viewpoints without ever disclosing these discriminatory motives. Such a scheme would understandably deter a current or future restoration applicant from expressing certain viewpoints. Accordingly, this system violates the principles articulated in *City of Lakewood*.

Imagine a restoration applicant with a social media presence filled with claims that the 2020 presidential election was stolen and expressing support for those convicted in connection with January 6, or an applicant who publicly expresses support for the right to an abortion or for a nationwide ban on the same. Nothing in Kentucky law prevents a Governor from covertly discriminating against such applicants and, in the absence of rules and criteria, there is simply no way to prove viewpoint discrimination in an as-applied challenge. *City of Lakewood*, 486 U.S. at 758–59. Consider, as well, the restoration applicant who holds any of the above

4

beliefs but is deterred from publicly sharing them because his restoration application is pending with a Governor known to have opposing political views. *Id.* at 757 ("[T]he mere existence of the licensor's unfettered discretion, coupled with the power of prior restraint, intimidates parties into censoring their own speech . . .").

## B. THE PANEL DECISION'S FORMALISM

The principal question presented by this case is whether a state official may selectively and arbitrarily grant or deny the right to vote to people with felony convictions consistent with the First Amendment. A threshold question is whether voting rights restoration in Kentucky *functions* as a licensing scheme such that the unfettered discretion doctrine applies. The panel's decision answered only this threshold question and, with respect, erred because it failed to adhere to the Supreme Court's and this Court's instructions to apply a functional approach to First Amendment challenges. Notwithstanding the labels Kentucky law affixes to voting rights restoration, *see, e.g.*, Ky. Rev. Stat. § 196.045(1)(e) ("partial pardon"), *functionally* there is no material difference between the state's voting rights restoration system and licensing. It is not sufficient to identify differences between voting rights restoration and licensing: these differences must have some material impact on the functional analysis the First Amendment commands. Repeating the district court's error, the panel's decision is silent as to whether any of these identified "differences" *make* any difference in the First Amendment analysis.

Notably, the mechanics and outcomes of Kentucky's voting rights restoration system are remarkably similar to those of a licensing system. Disenfranchised individuals with any federal, any out-of-state, or an enumerated Kentucky felony conviction apply to a government office seeking permission to vote. Appellants' Br. at 6–8 & n.5. The Kentucky Department of Corrections reviews the applicant's eligibility, and then the Governor grants or denies that application in his absolute discretion. *Id.* If denied, the applicant can re-apply. Absent permission from the Governor, the applicant may not lawfully engage in the unlicensed politically expressive conduct. Ky. Rev. Stat. §§ 119.025, 532.020(1)(a). Finally, as the panel concedes, "the result of the felon reenfranchisement scheme is that a felon is 'allowed' to vote again, where previously prohibited. And the result of a license or permit is that a person is 'allowed' to engage in regulated conduct, where they were previously prohibited." Op. at 11.

Notwithstanding these functional commonalities, the panel focuses its attention on the Kentucky Constitution and statutes that refer to voting rights restoration as an "executive pardon" and a "partial pardon." Ky. Const. § 145; Ky. Rev. Stat. § 196.045(1)(e). However, voting rights restoration is one of the many legal effects of a pardon in Kentucky;[2] it is not itself a pardon. Restoration is not

---

[2] The district court also notes that "[r]estoring a felon's right to vote is just one of many possible effects of a pardon." R. 68, Page ID # 847–49.

intrinsically part of clemency: forty states plus D.C. handle voting rights restoration entirely outside their clemency systems—a reality the panel ignores. Appellants' Br. at 46–47 & n.16.[3] Appellee's own Executive Order 2019-003 itself disclaims that the grant of voting rights restoration bears any of the other effects of pardons. Executive Order 2019-003, RE 53-1, Page ID # 764. Ultimately, the phrase "partial pardon" has a strained, almost oxymoronic ring that betrays an understanding that rights restoration and pardons are different in kind.

Regardless, these state law semantics are irrelevant to the First Amendment question at issue, because the U.S. Supreme Court has repeatedly stated for decades that First Amendment rights and doctrines must be evaluated functionally, not formalistically. *See* Appellants' Br. at 36–38 (citing, *inter alia*, *Garcetti v. Ceballos*, 547 U.S. 410, 424–25 (2006) (in First Amendment retaliation claim concerning whether public employee had spoken as government employee or private citizen, "[t]he proper inquiry is a practical one" and "[f]ormal job descriptions" are not dispositive); *Press-Enter. Co. v. Superior Ct. of California for Riverside Cnty.*, 478 U.S. 1, 7–10 (1986) ("[T]he First Amendment question cannot be resolved solely on the label we give the event, *i.e.*, 'trial' or otherwise, particularly where the

---

[3] Though Appellants' Brief noted thirty-eight such states plus D.C. have non-discretionary restoration systems, this was due to the inadvertent omission of Maine and Vermont, which do not disenfranchise people convicted of felonies, from the total.

preliminary hearing functions much like a full-scale trial."); *Branti v. Finkel*, 445 U.S. 507, 518–19 (1980) ("[T]he ultimate inquiry is not whether the label 'policymaker' or 'confidential' fits a particular position . . ."); *Bigelow v. Virginia*, 421 U.S. 809, 818–26 (1975) ("Regardless of the particular label asserted by the State—whether it calls speech 'commercial' or 'commercial advertising' or 'solicitation'—a court may not escape the task of assessing the First Amendment interest at stake and weighing it against the public interest allegedly served by the regulation."); *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 67 (1963) ("We are not the first court to look through forms to the substance and recognize that informal censorship may sufficiently inhibit the circulation of publications to warrant injunctive relief."); *Nat'l Ass'n for Advancement of Colored People v. Button*, 371 U.S. 415, 429 (1963) ("[A] State cannot foreclose the exercise of constitutional rights by mere labels.")); *see also Lebron v. Nat'l R.R. Passenger Corp.*, 513 U.S. 374, 392–93 (1995) ("The Constitution constrains governmental action by whatever instruments or in whatever modes that action may be taken . . . And under whatever congressional label.") (citation omitted). Seizing on the "partial pardon" label in Kentucky law leads the panel to misapply and breach this longstanding directive.

As a result, the panel proceeds to erroneously compare the features of pardons and licensing, bringing the panel's ruling into conflict with this Court's and the

Supreme Court's precedents. Representative of this central error is the panel's summation:

> Mere similarity in result does not change the nature of the vehicle used to reach that result, and Kentucky law is clear that it restores felons their voting rights through a partial executive pardon, not through the granting of an administrative license. . . So, regardless of any similarity in outcome—in that a pardoned felon and a licensed civilian may both engage in conduct previously forbidden—the vehicles to achieve that outcome remain fundamentally different.

Op. at 11–12. The panel's unsubstantiated assertion that the "nature of the vehicle"—and *not* the "result" or "outcome"—is dispositive, directly contradicts the litany of Supreme Court precedents Plaintiffs cited to the panel, forbidding formalistic analysis in a wide spectrum of First Amendment contexts and requiring a practical, functional inquiry. *See infra* at 7–8. The panel's focus on "the nature of the vehicle" erroneously privileges means over ends and minimizes the practical effects of Kentucky's voting rights restoration system.

The panel's reasoning also conflicts with this Court's precedent establishing that a functional analysis requires an examination of practical effects. In *Vogel v. U.S. Office Products Co.*, this Court held that a remand order is dispositive and, therefore, can only be granted by a district court, not a magistrate judge. 258 F.3d 509, 511 (6th Cir. 2001). In so ruling, this Court wrote:

> [W]e apply *a functional equivalency test to see if a particular motion has the same practical effect as a recognized dispositive motion* [in the federal statute]. Applying that test . . ., we too find that *a remand order is the functional equivalent of an order to dismiss. The practical effect*

9

> *of remand orders and orders to dismiss can be the same*; in both, cases
> are permitted to proceed in state rather than federal court.

*Id*. at 517 (emphasis added). Crucially, this Court did not dwell on the substantial differences between remand orders and orders to dismiss—the quite dissimilar "nature" of those two "vehicle[s]," Op. at 11—but rather on the practical effect of each. *Vogel*, 258 F.3d at 514–17.

*Vogel* relied on the Supreme Court's decision in *Quackenbush v. Allstate Insurance Co.*, which held that a remand order was appealable even though such orders "do not meet the traditional definition of finality." 517 U.S. 706, 715 (1996). Nonetheless, this difference in "the nature of the vehicle," to use the panel's phrase, was immaterial because the remand order was "functionally indistinguishable" from a stay order the Court had previously found appealable in a separate case. *Id*. at 714–15. Like a stay order, a remand "puts the litigants . . . 'effectively out of court,' […] and its *effect* is 'precisely to surrender jurisdiction of a federal suit to a state court.'" *Id*. (citations omitted, emphasis added); *see also In re Rizzo*, 741 F.3d 703, 705 (6th Cir. 2014) (holding unpaid "business tax" constitutes "excise tax" not dischargeable in bankruptcy "by engaging in a 'functional examination'" that requires "evaluat[ing] the statute's '*actual effects*'") (emphasis added). This Court's focus on practical effects—properly privileging ends over means—is what a functional

analysis requires.[4] Here, the panel decision has upended this framework and erased the dichotomy between formalism and functionality.

The panel's statement also cannot be squared with this Court's recent First Amendment rulings assessing what qualifies as a prior restraint. In *Novak v. City of Parma*, this Court wrote that "in light of our long history of guarding against prior restraints on speech, we should not be overly formalistic in defining what counts as an administrative order. . . [T]he formality of these classic cases should be a sufficient condition for prior restraint, not a necessary one." 932 F.3d 421, 432–33 (6th Cir. 2019); *see also Whitney v. City of Milan*, 677 F.3d 292, 295–99 (6th Cir. 2012) (finding public employer's informal order that employee refrain from speaking to terminated coworker constituted prior restraint). The same kind of functional inquiry articulated in *Novak* must also apply in the closely related context of evaluating whether a challenged practice, action, or law functions as a licensing scheme. *See Ostergren v. Frick*, 856 F. App'x 562, 570 n.10 (6th Cir. 2021) (unpublished) (citing *Novak*'s "recognition that the prior-restraint doctrine should be

_____

[4] This Court's sister circuits are in accord—a functional analysis requires analyzing practical effects. *See Martinez v. Carnival Corp.*, 744 F.3d 1240, 1243–44 (11th Cir. 2014) (citations omitted) (applying Supreme Court's "functional test for finality" which requires "look[ing] to the practical effect of the district court's order, not to its form"); *Gautreaux v. Chicago Hous. Auth.*, 178 F.3d 951, 956–57 (7th Cir. 1999) ("This court has repeatedly held that it will look beyond labels such as 'clarification' or 'modification' to the actual effect of the order.").

applied functionally" and noting "it may be possible for a government to create a de facto licensing scheme").

## C. THE PANEL DECISION'S COMPARISON OF VOTING RIGHTS RESTORATION AND LICENSING

To the extent the panel decision does compare voting rights restoration and licensing, it neither considers the highly similar mechanics between the two nor explains why any of the perceived differences it enumerates materially impact the First Amendment analysis. The panel seizes upon several purported differences between voting rights restoration, as practiced in Kentucky, and licensing, as described in the relevant First Amendment precedents. Each is an immaterial distinction because none alters the practical effects of voting rights restoration.

*First*, the panel points to the retrospective effect of pardons. But voting rights restoration, which is not itself a pardon, is *functionally* and predominantly prospective in effect, notwithstanding any concurrent retrospective effect. Indeed, the purported prospective/retrospective distinction is not rigid, as the panel portrays it. After all, the Governor may grant a pardon even "prior to formal indictment." *Fletcher v. Graham*, 192 S.W.3d 350, 359 (Ky. 2006). And while it may be accurate to say that restoration reverses or "nullif[ies]" one of the consequences of a felony conviction, Op. at 6, this legal effect is not principally retrospective. As a functional matter, the practical effect of voting rights restoration is felt prospectively: even once an individual's right to vote is restored, that person cannot regain the ability to vote

in past elections. Re-enfranchisement does not and cannot restore these citizens' opportunities to express their political views through the ballot box in elections gone by.

Additionally, with respect to those convicted as juveniles, voting rights restoration has no retrospective effect. To the extent the panel has concluded that voting rights restoration is backward-looking because it "restores the felon to the status quo before the conviction," Op. at 8, as Appellants noted in their opening brief, individuals convicted of felonies as juveniles never could vote and have never voted in their lives. Appellants' Br. at 26 n.11. For them, voting rights "restoration" is functionally first-time enfranchisement, not re-enfranchisement.

Most importantly, the panel fails to articulate why its proffered prospective/retrospective binary or restoration to the status quo ante has any material bearing on the First Amendment unfettered discretion analysis and the principles and concerns articulated in *City of Lakewood* and related precedents. Whether one views voting rights restoration as having prospective effects or both prospective and retrospective effects does not *functionally* alter the manifest risk of undetectable viewpoint discrimination in giving a government official like Governor Beshear sole and unfettered power to selectively bestow voting rights on a particular class of individuals without any reasonable definite time limits on such determinations.

*Second*, the panel adopts Appellee's contention that voting rights restoration is a "one-time act of clemency." Op. at 6–7. Restoration applicants who are denied one or more times will have recurring encounters with the Governor's discretionary vote-licensing system. In the meantime, an applicant will understandably be deterred from public political expression that might compromise pending or future attempts to secure the Governor's permission to vote. The ballot may be secret, but applicants' political views are just a Google, social media, or database search away. *City of Lakewood*, 486 U.S. at 759 ("[T]he licensor does not necessarily view the text of the words about to be spoken, but can measure their probable content or viewpoint by speech already uttered."). However, even assuming the accuracy of this characterization for argument's sake, the panel fails to explain what *functional*, material difference the "one-time" nature of restoration could possibly make in evaluating the manifest risk of viewpoint discrimination in giving a government official like Governor Beshear sole and absolute power to bestow voting rights selectively. Once again, focusing on the practical effects, as is required for functional analysis, demonstrates that this perceived difference has no bearing on the constitutional inquiry.

*Third*, the panel reasons that "[p]ermits or licenses regulating First Amendment activity by their nature do not restore any 'lost' rights; they only regulate how persons may engage in or exercise a right they already possess." Op.

at 8. But even the panel does not seem to believe in this purported distinction, noting the commonality between permitting a restoration applicant "to vote again, where previously prohibited" and permitting a license applicant "to engage in regulated conduct, where they were previously prohibited." *Id*. at 11. The fact that a person with a felony conviction is ineligible to vote prior to securing permission to do so is not a point of divergence, as license applicants also cannot engage in the "regulated conduct" prior to securing a permit to do so. That the latter group enjoys a freedom of speech or assembly in the abstract is another immaterial distinction, as such license applicants are strictly prohibited from engaging in the specific First Amendment-protected expression or expressive conduct until they secure a license to do so. In this way, the panel's reasoning appears to assume a system without time, place, and manner restrictions and devoid of licensing requirements. However, restoration applicants and license applicants are in the exact same posture: seeking permission to engage in specific expression or expressive conduct that is forbidden without prior authorization.

Accordingly, the panel's decision impermissibly allows state law labels, rather than practical effects, to dictate the scope of the First Amendment's protection and relies upon distinctions reflecting no functional, material difference from licensing to conclude that voting rights restoration in Kentucky does not operate as

a licensing scheme. Not only was this error, but it was error that conflicts with decisions of the U.S. Supreme Court and this Court.

## II. THIS APPEAL PRESENTS A QUESTION OF EXCEPTIONAL PUBLIC IMPORTANCE.

As recognized by the Governor in his executive order, "the right to vote is the foundation of a representative government" and restoration of that right fosters "rehabilitation and reintegration into society" and reduces recidivism. Executive Order 2019-003, RE 53-1, Page ID # 762. Approximately 15,000 adults complete parole or probation each year in Kentucky, causing the population of post-sentence but disenfranchised individuals to grow continuously.[5] Many disenfranchised Kentuckians remain subject to an arbitrary voting rights restoration scheme and are consequently exposed to the threat of viewpoint discrimination.

Additionally, this case has implications beyond the right to vote. Through its formalism and surface-level functional analysis, the panel decision gives state government officials free rein to subject First Amendment-protected political expression and expressive conduct to arbitrary treatment by disguising their

---

[5] The Bureau of Justice Statistics ("BJS") reported that 5,657 adults completed parole and 10,660 adults completed probation in 2021. U.S. Dep't of Justice, *Probation and Parole in the United States* (2021), at 23, 30, *available at* https://bjs.ojp.gov/sites/g/files/xyckuh236/files/media/document/ppus21.pdf. BJS reported that 6,780 adults completed parole and 9,792 adults completed probation in 2020. U.S. Dep't of Justice, *Probation and Parole in the United States* (2020), at 21, 26, *available at* https://bjs.ojp.gov/content/pub/pdf/ppus20.pdf.

licensing scheme with immaterial distinctions. Numerous administrative licensing schemes previously invalidated on First Amendment grounds might be resurrected if officials relabel or superficially modify them, so they are less obviously or less formally such. *Cf. Novak*, 932 F.3d at 433 ("A government official should not have to declare his order official or jump through certain procedural hoops to create a prior restraint. Such a rule would allow government officials to cloak unconstitutional restraints on speech under the cover of informality.").

## CONCLUSION

Accordingly, Appellants request that the panel grant their petition for rehearing or, alternatively, that this Court grant their petition for rehearing en banc.

DATED: August 3, 2023

Respectfully submitted,

*/s/ Jon Sherman*
Jon Sherman
D.C. Bar No. 998271
Michelle Kanter Cohen
D.C. Bar No. 989164
FAIR ELECTIONS CENTER
1825 K St. NW, Suite 701
Washington, DC 20006
Phone: (202) 331-0114
jsherman@fairelectionscenter.org
mkantercohen@fairelectionscenter.org

Ben Carter
Kentucky Bar No. 91352
KENTUCKY EQUAL JUSTICE CENTER
222 South First Street, Ste. 305
Louisville, KY 40202
Phone: (502) 303-4062
ben@kyequaljustice.org

*Counsel for Plaintiffs-Appellants*

# RULE 32(g) CERTIFICATE

I hereby certify that this document, including all headings, footnotes and quotations, but excluding the Table of Contents, Table of Authorities, and any certificates of counsel, contains 3,882 words, as determined by the word count of the word-processing software used to prepare this document, specifically Microsoft Word for Mac Version 16.49 in Times New Roman 14-point font, which is fewer than the 3,900 words permitted under Fed. R. App. P. 35(b)(2).

*/s/ Jon Sherman*
Jon Sherman

August 3, 2023

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on August 3, 2023, an electronic copy of Plaintiffs-Appellants' Petition for Rehearing and Rehearing En Banc was filed with the Clerk of the Court for the United States Court of Appeals for the Sixth Circuit by using the CM/ECF system. The undersigned also certifies that participants who are registered CM/ECF users will be served via the CM/ECF system.

*/s/ Jon Sherman*
Jon Sherman

August 3, 2023

# EXHIBIT A

NOT RECOMMENDED FOR PUBLICATION
File Name: 23a0332n.06

No. 22-5703

| | |
|---|---|
| DERIC JAMES LOSTUTTER, ROBERT CALVIN LANGDON, and BONIFACIO R. ALEMAN, | ) ) ) ) |
|     Plaintiffs-Appellants, | ) ) |
| v. | ) ) |
| COMMONWEALTH OF KENTUCKY, | ) ) |
|     Defendant, | ) ) |
| ANDREW G. BESHEAR, in his official capacity as Governor of Kentucky, | ) ) ) |
|     Defendants-Appellees. | ) ) |

**FILED**
Jul 20, 2023
DEBORAH S. HUNT, Clerk

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF KENTUCKY

OPINION

Before: BOGGS, WHITE, and READLER, Circuit Judges.

**WHITE, Circuit Judge.**    In this First-Amendment challenge to Kentucky's felon-reenfranchisement scheme, Plaintiffs Deric Lostutter, Robert Langdon, and Bonifacio Aleman appeal the dismissal of their claims for lack of standing, contending that they satisfied all standing requirements under the unfettered-discretion doctrine.[1]   Because Plaintiffs concede that their argument turns on a finding that Kentucky's voting-rights restoration process constitutes an administrative licensing or permitting scheme, and we conclude that this is not the case, we affirm the district court's dismissal of all claims without prejudice.

---

[1] The Supreme Court has held that, when bringing a facial challenge to a licensing or permitting scheme that allegedly gives government officials unfettered discretion to grant or deny licenses, a plaintiff need not apply for and be denied a license to challenge such a scheme's constitutionality. *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 755–56 (1988).  Rather, "a licensing provision coupled with unbridled discretion itself amounts to an actual injury." *Prime Media, Inc. v. City of Brentwood*, 485 F.3d 343, 351 (6th Cir. 2007) (citations omitted).

No. 22-5703, *Lostutter v. Commonwealth of Ky., et al.*

## I.

### A.

Section 145 of the Kentucky Constitution strips convicted felons of the right to vote:

> Persons convicted in any court of competent jurisdiction of treason, or felony, or bribery in an election, or of such high misdemeanor as the General Assembly may declare shall operate as an exclusion from the right of suffrage, but persons hereby excluded may be restored to their civil rights by executive pardon.

Ky. Const. § 145.  A Kentucky statute outlines the process by which a person's right to vote may be restored:  a convicted felon may submit a request for restoration of civil rights to the Kentucky Department of Corrections (KDOC) and, if KDOC determines that the felon qualifies as an "eligible offender,"[2] the request will be forwarded to the Governor "for consideration of a partial pardon."  Ky. Rev. Stat. Ann. § 196.045.  The Governor then exercises his or her complete discretion in granting or denying the request.  R. 57-1, PID 788 ("It is the prerogative of the Governor afforded him or her under the Kentucky Constitution to restore these rights.").

### B.

In the operative complaint, eight plaintiffs—all disenfranchised residents of Kentucky with felony convictions who wish to vote in future elections—sued the Kentucky Governor in his official capacity under 42 U.S.C. § 1983, alleging that Kentucky's voting-rights restoration scheme violated the First Amendment because it (1) provided unfettered discretion to the Governor to restore civil rights (Count 1), and (2) did not contain a limitation on the time to exercise that discretion (Count 2).  Essentially, Plaintiffs argued that Kentucky's reenfranchisement process operated as an administrative licensing or permitting scheme, and therefore it must adhere to the

---

[2] Kentucky law defines an "eligible felony offender" as a person convicted of one or more felonies who has received a final discharge or expiration of sentence, does not have any pending warrants, charges, or indictments, and does not owe any outstanding restitution.  Ky. Rev. Stat. Ann. § 196.045(2).

No. 22-5703, *Lostutter v. Commonwealth of Ky., et al.*

constitutional standards applied when officials grant or deny licenses or permits to engage in First Amendment-protected activity. The operative complaint sought a declaration that the restoration scheme violated the First Amendment, and a permanent injunction ordering the Governor to establish a new reenfranchisement scheme that "restores the right to vote to felons based upon specific, neutral, objective, and uniform rules and/or criteria[.]" R. 31, PID 357-58.

While cross-motions for summary judgment were pending before the district court, Kentucky Governor Andrew Beshear issued Executive Order (EO) 2019-003, providing that a convicted felon's right to vote would be automatically restored upon the final discharge or expiration of his or her sentence, provided the crime of conviction was a Kentucky offense not involving treason, bribery in an election, criminal or fetal homicide, second-degree assault or assault under extreme emotional disturbance, first-degree strangulation, human trafficking, or violence as defined by Kentucky law. Three plaintiffs automatically became eligible to vote under EO 2019-003 and voluntarily dismissed their claims as moot. Five months later, the district court dismissed all remaining Plaintiffs' claims as moot on the basis that EO 2019-003 appeared to provide the relief they requested: non-arbitrary criteria to guide the process for restoration of voting rights.

Plaintiffs timely appealed to this court, and we concluded that EO 2019-003 failed to provide relief to Lostutter, Langdon, and possibly Aleman—because although it may have "established a separate non-discretionary restoration track for certain felons who qualify," Lostutter and Langdon did not qualify for that track "because they were convicted, respectively, of a federal offense and of second-degree assault under Kentucky law." *Lostutter v. Kentucky*, No. 21-5476, 2021 WL 4523705, at *2 (6th Cir. Oct. 4, 2021). "For felons like them, EO 2019-003 left intact the discretionary scheme set out in Ky. Const. § 145 and Ky. Rev. Stat. Ann. § 196.045,

No. 22-5703, *Lostutter v. Commonwealth of Ky., et al.*

which is the same one challenged in the operative complaint. Thus, EO 2019-003 did not remove the harms that Lostutter and Langdon allege, and the case remains suitable for judicial determination." *Id.*[3] We reversed and remanded for further proceedings.

### C.

On remand, when faced with the same cross-motions for summary judgment, the district court again dismissed the remaining three Plaintiffs' claims, this time for lack of standing. It held:

> Here, it is not immediately apparent that Plaintiffs have suffered an injury in fact because they have never participated in the reenfranchisement scheme they challenge. . . . Langdon has applied for restoration of his right to vote, and he states that his application is pending before the Governor. (R. 31 ¶ 7.) Aleman and Lostutter have not applied. (R. 31 ¶ 7.)

R. 68, PID 846.[4] It also rejected Plaintiffs' argument that Kentucky's reenfranchisement process constituted an administrative licensing or permitting scheme, such that standing existed under the unfettered-discretion doctrine without regard to whether Plaintiffs applied for and were denied restoration of their rights. The district court explained:

> "Licensing" generally refers to "[a] governmental body's process of issuing a license," and a "license" is "permission, usually revocable, to commit some act that would otherwise be unlawful." *Licensing*, *Black's Law Dictionary* (11th ed. 2019). . . . [A] "permit" is defined as the certificate or official written statement evidencing that someone has permission or the right to do something. *Permit*, *Black's Law Dictionary* (11th ed. 2019).
>
> A pardon, on the other hand, is "[t]he act . . . of officially nullifying punishment or other legal consequences of a crime." *Pardon*, *Black's Law Dictionary* (11th ed.

---

[3] Regarding Aleman, we noted that he

> [m]aintain[ed] that he does not qualify for automatic restoration of his right to vote because he was convicted of first-degree robbery. However, it appears that only first-degree robberies committed after July 15, 2002, are considered disqualifying violent offenses, Ky. Rev. Stat. Ann. § 439.3401(8), and the record suggests that Aleman was convicted of this offense in 1997. The district court should clarify Aleman's status on remand.

*Id.* at *2 n.4. On remand, Plaintiffs confirmed that Aleman's claims were not moot because he was convicted of a felony in Indiana, and out-of-state convictions are excluded under EO 2019-003.

[4] Aleman has since submitted his application, according to his counsel. At the time of oral argument, it remained pending before the Governor.

No. 22-5703, *Lostutter v. Commonwealth of Ky., et al.*

2019); *see also Fletcher*, 192 S.W.3d at 362 ("A 'pardon' is the act or an instance of officially nullifying punishment or other legal consequences of a crime.") (cleaned up). Receipt of a pardon can give a pardonee permission to do something that would otherwise be unlawful, such as vote, and in that narrow respect it bears some superficial similarity to a license. But a pardon cannot be characterized as a mere license to vote—restoration of the right to vote is just one of several potential effects of a pardon.

. . .

A pardon is also retrospective, as opposed to prospective. A pardon nullifies the legal consequences of one's past actions, whereas a license prospectively grants one permission to do something that would otherwise result in legal consequences.

. . .

A pardon is fundamentally different than a license and cannot be fairly characterized as a mere license to vote. Restoring a felon's right to vote is just one of many possible effects of a pardon. Beyond that single superficial similarity, a license and a pardon bear virtually no resemblance to one another. The nature of a pardon is to extend grace to a person with regard to certain consequences of their actions. A license, on the other hand, simply gives a person permission to engage in regulated activity. The Plaintiffs' argument is simply incorrect—in Kentucky, an executive pardon is not a license.

R. 68, PID 847-49 (footnote omitted). It thus concluded that *City of Lakewood* and its progeny did not apply, and dismissed the remaining Plaintiffs' claims without prejudice for lack of standing. Plaintiffs timely appealed.

## II.

Plaintiffs maintain that dismissal on jurisdictional grounds was improper because the unfettered-discretion doctrine confers standing without regard to whether they actually applied for, and were denied, restoration of their right to vote. However, Plaintiffs also urge this court to "construe the district court's opinion to have reached and ruled on the merits" and "review [the] decision accordingly." Appellant Br. at 21; Oral Arg. at 8:20-8:50. In either case, Plaintiffs conceded at argument that their claims rest entirely on the contention that Kentucky's voting-rights

No. 22-5703, *Lostutter v. Commonwealth of Ky., et al.*

restoration process constitutes a licensing or permitting scheme. Because this underlying argument lacks merit, we affirm the district court's dismissal of all claims.

Contrary to Plaintiffs' assertions that Kentucky's voting-rights restoration scheme is fundamentally different from a pardon, the Kentucky Constitution expressly characterizes felon reenfranchisement as a type of executive pardon. Ky. Const. § 145 (providing that felons excluded from the franchise "may be restored to their civil rights by executive pardon"). Associated statutes and Kentucky caselaw likewise refer to the Governor's discretionary power to restore voting rights as a "partial pardon." Ky. Rev. Stat. Ann. § 196.045(1)(e) (directing KDOC to "[f]orward information on a monthly basis of eligible felony offenders who have requested restoration of rights to the Office of the Governor for consideration of a partial pardon"); *Anderson v. Commonwealth*, 107 S.W.3d 193, 195 (Ky. 2003) (holding that a "partial pardon" granted pursuant to Sections 145 and 150 of the Kentucky Constitution "only restored [an individual's] right to vote and to hold office and did not restore his 'right' to be a juror"); *Cheatham v. Commonwealth*, 131 S.W.3d 349, 351 (Ky. Ct. App. 2004) (holding that a "partial pardon" restoring a felon's rights to vote and hold public office did not encompass restoration of his right to possess a firearm). Plaintiffs' suit is therefore a challenge to an aspect of Kentucky's pardon regime, whether they characterize it that way or not. And receiving an executive pardon—partial or complete—is fundamentally different from obtaining an administrative license or permit.

First, as the district court explained, pardons are retrospective in the sense that they look backwards and excuse—indeed, nullify the consequences of—past misconduct. A license, in contrast, is usually prospective in that it looks forward and grants permission to engage in some future conduct. So, while a governor cannot pardon future crimes, licenses typically grant permission for an activity that has not yet occurred. Further, the Governor accurately observes

No. 22-5703, *Lostutter v. Commonwealth of Ky., et al.*

that a partial pardon is a one-time act of clemency, while a typical licensing or permitting scheme is ongoing—that is, the license or permit must be renewed periodically.[5]    Third, felon reenfranchisement in Kentucky derives from the Governor's executive clemency power, which the Supreme Court has rarely subjected to judicial review.  *See Ohio Adult Parole Auth. v. Woodard*, 523 U.S. 272, 276 (1998) (reiterating that as a fully discretionary "matter of grace," pardons and commutation decisions "have not traditionally been the business of courts; as such, they are rarely, if ever, appropriate subjects for judicial review," therefore "[t]he Due Process Clause is not violated where, as here, the procedures in question do no more than confirm that the clemency and pardon powers are committed, as is our tradition, to the authority of the executive" (quoting *Conn. Bd. of Pardons v. Dumschat*, 452 U.S. 458, 464 (1981))); *see also Herrera v. Collins*, 506 U.S. 390, 413-15 (1993) (outlining the history of the federal pardon and state-level clemency schemes). In contrast, a licensing scheme regulating First Amendment-related conduct is typically grounded in the State's authority to promote public safety and well-being.  *See Cox v. New Hampshire*, 312 U.S. 569, 574 (1941) ("The authority of a municipality to impose regulations in order to assure the safety and convenience of the people in the use of public highways has never been regarded as inconsistent with civil liberties but rather as one of the means of safeguarding the good order upon which they ultimately depend.").  Such authority, when used to curtail free speech, is subject to extensive judicial review.  *See id.* at 576 (holding that licensing schemes regulating speech must

---

[5] Plaintiffs contest this characterization, arguing that (1) it "assumes that an individual will only face felony disenfranchisement once in their lifetime"; and (2) "if the restoration application is denied one or more times, the licensing process will not be a one-time encounter."  Reply Br. at 15.  But both hypotheticals ignore the true distinction between the two processes:  after a *successful* reenfranchisement, a felon need not re-apply for a new pardon every election cycle for fear that his right to vote has expired.  A typical license or permit, on the other hand, must be routinely re-granted; should the applicant let it lapse, he or she may no longer engage in the regulated conduct.  A partial pardon can therefore be fairly characterized as a "one-time" act of the clemency in the sense that *at the time it is granted* there is no predetermined expiration date for the restored right to vote, whereas the effects of a typical license or permit last only a fixed amount of time before they expire.

No. 22-5703, *Lostutter v. Commonwealth of Ky., et al.*

serve an important government interest); *see also Kunz v. New York*, 340 U.S. 290, 293-94 (1951) (noting that the Supreme Court has "consistently condemned licensing systems which vest in an administrative official discretion to grant or withhold a permit upon broad criteria unrelated to proper regulation of public places" and listing cases). Plaintiffs fail to explain why we should conflate the distinct processes of licensing and pardons, rooted as they are in separate provisions of Kentucky law, subject to differing levels of judicial scrutiny by the Supreme Court, and implemented to accomplish unrelated goals.

Perhaps most importantly, a pardon restores the felon to the status quo before the conviction, in that he or she regains a right once held but lost due to illegal conduct. Permits or licenses regulating First Amendment activity by their nature do not restore any "lost" rights; they only regulate how persons may engage in or exercise a right they already possess. So, while a person applying for a newspaper rack or parade permit is attempting to exercise his or her First Amendment right to freedom of speech, a felon can invoke no comparable right when applying to the Governor for a pardon because the felon was constitutionally stripped of the First Amendment right to vote. *Compare City of Lakewood*, 486 U.S. at 768 (explaining that the true "activity" at issue was "the circulation of newspapers, which is constitutionally protected"); *with Dumschat*, 452 U.S. at 467 (holding that "[a] state cannot be required to explain its reasons for a [commutation] decision when it is not required to act on prescribed grounds," because the power vested in the State to commute sentences "conferred no rights on respondents beyond the right to seek commutation"), *and Ohio Adult Parole Auth.*, 523 U.S. at 282–83 (holding that a Governor's executive discretion in matters of clemency "need not be fettered by the types of procedural protections sought by respondent" because there was "no substantive expectation of clemency"). Accordingly, Kentucky requires felons to fill out an "application for the *restoration* of civil rights,"

No. 22-5703, *Lostutter v. Commonwealth of Ky., et al.*

R. 57-1, PID 787 (emphasis added), which properly reflects the fact that the felon lacks any fundamental interest to assert and seeks to regain his or her interest through the clemency process, rather than a "permit to vote," which would suggest that the felon already has an intrinsic right to vote, and must merely go through the proper regulatory hoops to exercise it.  *Cf. Johnson v. Bredesen*, 624 F.3d 742, 746 (6th Cir. 2010) (explaining that a state may constitutionally strip convicted felons of their right to vote, and that the plaintiffs, having constitutionally lost that right, lacked any fundamental interest to assert under the First Amendment).  Based on these significant distinctions, we agree with the district court that Kentucky's voting-rights restoration scheme is different in kind from an administrative licensing or permitting scheme.

Plaintiffs offer no authority to the contrary equating a partial pardon to a type of administrative license, or even treating the two similarly.  Plaintiffs' cited caselaw concerns only administrative schemes that were expressly designated as granting licenses or permits.  And they fail to provide a single case in which a court interpreted a restored right to vote as a license or permit to vote.  The State, on the other hand, points to Eleventh Circuit precedent holding that First Amendment cases invoking the unfettered-discretion doctrine are "inapposite to a reenfranchisement case."  *See Hand v. Scott*, 888 F.3d 1206, 1210 (11th Cir. 2018).  In *Hand,* disfranchised felons argued that Florida's reenfranchisement regime facially violated the First Amendment because it vested Florida's Executive Clemency Board with "unfettered discretion" to engage in a "standard-less process of arbitrary and discriminatory decision-making, which is untethered to any laws, rules, standards, criteria, or constraints of any kind, and unconstrained by any definite time limits," thereby abridging their right to vote and creating an impermissible risk of "arbitrary, biased, and/or discriminatory treatment."  *Id.* (quoting Plaintiffs' Motion for Summary Judgment at 16, 18).

9

No. 22-5703, *Lostutter v. Commonwealth of Ky., et al.*

The Florida felons relied on several of the same First Amendment cases cited by Plaintiffs, including *Forsyth County v. Nationalist Movement*, 505 U.S. 123 (1992), and *City of Lakewood,* 486 U.S. 750.  But on appeal, the Eleventh Circuit rejected the felons' theory and held that "this precedent [did] not bear directly on the matters presented" because none of the cases "involved voting rights or even mentioned the First Amendment's interaction with the states' broad authority expressly grounded in § 2 of the Fourteenth Amendment to disenfranchise felons and grant discretionary clemency."  *Id.*  Although the Eleventh Circuit did not directly address standing, its holding on the merits lends support to the State's argument that Plaintiffs' cited authority is inapt.

Plaintiffs resist this conclusion and maintain that the district court "erred by assessing whether full pardons function as licenses to vote instead of focusing on the sole and narrow question before it:  whether the grant or denial of a voting rights restoration application functions as vote licensing."  Appellant Br. at 40.  True, in two paragraphs the district court discussed the nature of a complete pardon, although the relevant Kentucky statute characterizes voting restoration as only a "partial pardon."  But this does not render the core thesis of the district court opinion incorrect:  an executive pardon in general functions differently than an administrative license or permit.  The district court's overall analysis of the differences between a license and a pardon remains sound.  For example, the distinction between the prospective nature of a license versus the retrospective nature of a pardon applies to both a partial and a full pardon.  So, while the district court might have avoided a discussion of full pardons, the two paragraphs that the district court devoted to that topic do not render the opinion as a whole incorrect.

Plaintiffs also contend that the district court erroneously placed "undue weight upon the 'clemency' label associated with voting rights restoration in Kentucky law."  Appellant Br. at 38. Plaintiffs insist that "notwithstanding the labels used under Kentucky law, the state's system of

No. 22-5703, *Lostutter v. Commonwealth of Ky., et al.*

giving its governors sole power to restore the right to vote to individuals with felony convictions—unbounded by any rules or criteria—is in all material respects a completely arbitrary licensing system no different from those long prohibited in the First Amendment context." *Id.* at 14.  Yet Plaintiffs never persuasively explain *why* voting restoration is more similar to a licensing scheme than to a partial executive pardon.  They never list the defining features of a licensing or permitting scheme, much less explain how the voting-rights restoration process possesses those characteristics.  Plaintiffs merely conclude that "[w]hen it comes to the functionality of Kentucky's voting rights restoration system, in all material respects, it operates as an administrative licensing scheme that selectively confers a right to vote upon certain individuals with felony convictions," without ever showing the concrete similarities between voting-rights restoration and obtaining a license.  Appellant Br. at 39.

Plaintiffs' only proffered similarity between the two concepts is that Kentucky's reenfranchisement scheme grants felons permission to vote in future elections, just as a license or permit grants permission to engage in conduct like a parade.  True, the result of the felon reenfranchisement scheme is that a felon is "allowed" to vote again, where previously prohibited.  And the result of a license or permit is that a person is "allowed" to engage in regulated conduct, where they were previously prohibited.  But this superficial parallel does not transform a partial executive pardon into an administrative license.  Mere similarity in result does not change the nature of the vehicle used to reach that result, and Kentucky law is clear that it restores felons their voting rights through a partial executive pardon, not through the granting of an administrative license.  And for the reasons discussed above, extending an executive pardon is fundamentally different from granting a permit or license.  So, regardless of any similarity in outcome—in that a

No. 22-5703, *Lostutter v. Commonwealth of Ky., et al.*

pardoned felon and a licensed civilian may both engage in conduct previously forbidden—the vehicles to achieve that outcome remain fundamentally different.

Finally, Plaintiffs argue that "[c]lemency rules and procedures are not immune from constitutional scrutiny." Appellant Br. at 43. That may be. But the district court never found to the contrary. It held only that Kentucky's voting-rights restoration process is not an administrative licensing or permitting scheme, therefore *City of Lakewood* did not allow for an exception to the traditional rules of standing. Affirming this decision does not insulate Kentucky's restoration process from constitutional review. It merely requires Plaintiffs to satisfy either the traditional rules of standing or some exception other than *City of Lakewood*'s unfettered-discretion doctrine before they may bring suit.

In sum, the district court correctly held that a partial executive pardon restoring the right to vote is not a permit or license to vote, and thus the unfettered-discretion doctrine does not apply. The *City of Lakewood* line of cases is therefore inapplicable and dismissal for lack of standing was proper.

**III.**

For the reasons set out above, we AFFIRM the district court's dismissal of all claims without prejudice.

# EXHIBIT B

_____

DERIC LOSTUTTER, ET AL. )  CASE NO.: 22-5703

  Appellants,   )

vs.         )

COMMONWEALTH OF KENTUCKY, )

ET AL.,       )

  Defendants.   )

_____)


TRANSCRIPTION OF AUDIO RECORDING

ORAL ARGUMENT

JUNE 22, 2023


_____

DIGITAL EVIDENCE GROUP

1730 M Street, NW, Suite 812

Washington, D.C. 20036

(202) 232-0646

```
 1   APPEARANCES:

 2

 3   PANEL JUDGES:

 4   SENIOR CIRCUIT JUDGE HELENE N. WHITE

 5   SENIOR CIRCUIT JUDGE DANNY J. BOGGS

 6   CIRCUIT JUDGE CHAD A. READLER

 7

 8   ON BEHALF OF PLAINTIFF:

 9   FAIR ELECTIONS CENTER

10   BY: JONATHAN SHERMAN, ESQUIRE

11   1825 K Street NW, Suite 450

12   Washington, D.C. 20006

13   BY: JONATHAN SHERMAN

14

15   ON BEHALF OF DEFENDANT:

16   OFFICE OF THE GOVERNOR OF KENTUCKY

17   BY: TAYLOR PAYNE, ESQUIRE

18   700 Capitol Avenue, Suite 100

19   Frankfort, Kentucky 40601

20

21

22

23

24

25
```

Page 3

1    JUNE 22, 2023

2          JUDGE READLER:  Case Number 22-5703, Deric

3    Lostutter, et al. versus Commonwealth of Kentucky et

4    al.  Oral argument not to exceed 15 minutes per side.

5          Mr. Sherman for the appellants?

6          Save three minutes for rebuttal?

7          MR. SHERMAN:  Yes.  That's correct, Your

8    Honor.

9          JUDGE READLER:  Okay.

10         MR. SHERMAN:  Thank you, Your Honor.  May it

11   please the Court, Jon Sherman for the appellants.

12         The district court made two errors in

13   dismissing plaintiffs' complaint.  First, the

14   district court applied a highly formalistic analysis

15   and erroneously conflated voting rights restoration

16   and pardons in deciding that the First Amendment

17   unfettered discretion doctrine had no application

18   here.

19         Second, having reached the constitutional

20   merits of plaintiffs' claims, the Court then

21   impermissibly backtracked and disposed of the case on

22   jurisdictional grounds.

23         I'll first address the jurisdiction error,

24   and I think I can do that quickly.  Steel Company

25   versus Citizens for a Better Environment and Bell v.

Page 4

1   Hood, both Supreme Court precedents, have both

2   decided that where the standing and the merits are

3   intertwined, it's impermissible for the Court to

4   reach the merits, decide the merits, and then recast

5   that determination as a jurisdictional ruling.

6       In this case, the Court necessarily reached

7   the merits of the First Amendment claims in the case

8   but then recast that determination as a lack of

9   standing and dismissed the case for lack of standing.

10   This Court as well in CHKRS just two years ago found

11   that this was impermissible. Again, that has to be

12   the rule because otherwise every time a plaintiff

13   lost a claim, it would be dismissed for lack of

14   standing, rather than for failure to state a claim.

15       And neither the District Court nor Governor

16   Beshear makes an argument that our claims are wholly

17   frivolous, insubstantial, or immaterial such that

18   they would fall within the narrow exception in Steel

19   Company. And the Governor's brief actually ignores

20   Steel Company and Bell v. Hood altogether.

21       So having addressed the jurisdictional

22   error, if there are no questions from the bench on

23   that particular point --

24       JUDGE READLER: Now, counsel, we obviously

25   have to assure ourselves of standing. We do that at

Page 5

1   every stage of the case.  So why is it that your

2   clients -- your three remaining clients have

3   standing?

4         MR. SHERMAN:  Right.  So under -- thank you,

5   Your Honor.  Under the Supreme Court's precedent and

6   this Court's precedent in cases like Prime Media and

7   Miller v. City of Cincinnati, there's per se standing

8   under the First Amendment on fettered discretion

9   doctrine, where a licensing scheme governing First

10  Amendment protected expressive conduct contains no

11  rules or criteria to constrain official discretion.

12  That's the case here.

13        Functionally, Kentucky's voting rights

14  restoration system operates as a licensing scheme.

15  There are no rules, no criteria whatsoever, and the

16  Court has said -- the Supreme Court has said with a

17  facial challenge, plaintiff's may facially challenge

18  such a scheme without first applying for and being

19  denied that permit.  That's City of Lakewood.

20        The individual facts of any permit

21  application are not relevant, the dispositive -- the

22  linchpin is really whether there's anything on the --

23  in the ordinance or statute in the laws that prevents

24  viewpoint discrimination.  Here, there is none, and

25  so facially, this -- plaintiff's can bring a fascial

Page 6

1   challenge and have standing to bring that facial

2   challenge.

3           JUDGE WHITE:  And so do you conceive that

4   everything depends upon characterizing this scheme as

5   a license?

6           MR. SHERMAN:  That is a threshold question.

7   It is one that, yes, we need to win Your Honor in

8   order for the First Amendment unfettered discretion

9   doctrine to apply, and we believe that a functional

10  approach needs to be taken, unlike the District

11  Court's formalistic approach.  And that would be

12  consistent with recent rulings from this Court in

13  Ostergren v. Frick from 2021, as well as Novak v.

14  City of Parma.  These cases apply to functional

15  analysis to the question of whether an administrative

16  order created a prior restraint in those cases.

17          Here, we believe this case also calls for a

18  functional analysis to be applied as to whether an

19  administrative licensing scheme has been created, and

20  here, plaintiff, all of our plaintiffs, are required

21  to submit an application to -- first, to the

22  Department of Corrections, and then if it has pashed

23  its threshold eligibility, it's referred to the

24  Governor's Office.  And then the Governor's Office

25  has complete and unfettered discretion to grant or

Page 7

1   deny permission to engage in First Amendment

2   protected expressive conduct, voting.  So that --

3            JUDGE READLER:  Well, why is voting First

4   Amendment expressive conduct?  Isn't it governed by

5   the -- if at all, by the Fourteen Amendment?

6            MR. SHERMAN:  Well, there are numerous

7   Supreme Court cases that say that voting is protected

8   as both expression -- expressive conduct and as means

9   for political association.

10           JUDGE READLER:  Well, association --

11           MR. SHERMAN:  I mean --

12           JUDGE READLER:  -- is different than -- I

13   mean, association, that's different.

14           MR. SHERMAN:  Correct.  Correct, Your Honor.

15   But we claim that it's protected as both, and -- but

16   even just sticking with political expression, there

17   are numerous cases from Norman v. Reed to Anderson v.

18   Celebrezze, Williams v. Rhodes that make clear that

19   it's not just the candidates or the political

20   parties' First Amendment interest in accessing the

21   ballot but also the voters' expressive interest in

22   being able, both individually and in the aggregate,

23   being able to express their preference for

24   candidates, parties --

25           JUDGE READLER:  What's the best case that

Page 8

1   says voting -- that says that, you know, the right to

2   vote, formally, the right to go in the ballot box and

3   check your ballot is a First Amendment protected

4   activity?

5           MR. SHERMAN:  Norman v. Reed is one of the

6   best, everything in the Anderson verdict line of

7   cases.  A lot of these cases deal with voting, and

8   they are dealing with it under both the First and

9   Fourteenth Amendment.  We're, of course, proceeding

10  just under the First Amendment.

11          We'd also point to the Court's -- the

12  Supreme Court's decision in Doe v. Reed, right.  The

13  fact that there was a legal effect to the political

14  expression in Doe v. Reed didn't negate the

15  expressive character of that -- the petition

16  signatures in that case, right.  Similarly here, just

17  because voting has a legal effect in casting a

18  ballot, it doesn't negate the expressive content of

19  casting a vote.

20          JUDGE READLER:  Petition signature is about

21  getting on the ballot, and those cases seem to be

22  fairly clear.  But actually an individual's voting is

23  distinct from getting a candidate on the ballot.

24          MR. SHERMAN:  Correct, Your Honor.  But

25  there are numerous cases that --

Page 9

1           JUDGE READLER:  (Indiscernible)

2           JUDGE BOGGS:  I mean, isn't it -- counsel,

3     isn't it particular that casting the ballot itself

4     isn't expressive because nobody knows how it comes

5     out.  In fact, if anything, the anti-selfie ballot

6     laws are assigned that the law wants to make sure

7     that the voting isn't expressive.

8           MR. SHERMAN:  Thank you, Judge Boggs.  I

9     would point to two things in response to that

10    question, one, McIntyre v. Ohio Elections Commission,

11    right.  The anonymity of speech does not negate the

12    expressive content of that speech.  In that case, the

13    Supreme Court struck down Ohio's ban --

14          JUDGE READLER:  I'm sorry.  Those were

15    petitions, right, petitions (indiscernible) --

16          MR. SHERMAN:  Anonymous pamphlets in that

17    case.

18          JUDGE BOGGS:  That's anonymous speech, but

19    again the people knew that somebody was saying it.

20    Okay.  Like if I could take you back one step just

21    procedurally, so after your standing argument, if we

22    accept that, is there any problem with our going

23    forward and either ruling in your favor or against

24    you on the merits?

25          MR. SHERMAN:  No, Your Honor.  We believe

1   that the Court -- the District Court has already

2   essentially ruled on the merits.  The first paragraph

3   of its order seems to believe that the Court was

4   ruling on the merits, and then once given that it was

5   a ruling on the merits below, we think it's

6   permissible for this Court to reach the merits.  And

7   on the merits, we believe the First Amendment

8   unfettered discretion --

9            JUDGE BOGGS:  Well, obviously, you want to

10  win, but if we decided that you lost on the merits,

11  that wouldn't be procedurally improper in your view?

12           MR. SHERMAN:  No, Your Honor.  Indeed, we

13  believe Steel Company and Bell v. Hood instruct that

14  this Court should reach the merits because that's

15  what the Court effectively did and then backtracked

16  --

17           JUDGE BOGGS:  Thank you.

18           MR. SHERMAN:  -- to lack of standing.

19           So on the merits holding -- and we've

20  already rehearsed the Supreme Court's decisions

21  regarding facial challenges --

22           JUDGE READLER:  Let's go back to -- let's go

23  back to the standing issue.  I guess one of your

24  three clients has applied for a pardon?

25           MR. SHERMAN:  Two have actually applied for

Page 11

1   voting rights restoration.  We obviously dispute that

2   voting rights restoration is just one of the effects

3   of a pardon, but it is not in itself a pardon.  Under

4   state law, the Kentucky Courts and the Kentucky

5   statute have labeled it -- they tried to split the

6   difference and call it (indiscernible) --

7           JUDGE READLER:  Was it one?  Is the second

8   one more recent?  I just -- I thought it was one

9   there.

10          MR. SHERMAN:  The second one is more recent.

11  Bonifacio al Aman (phonetic) applied more recently --

12          JUDGE READLER:  Mr. Lostutter hasn't

13  applied?

14          MR. SHERMAN:  (Indiscernible) -- Deric

15  Lostutter has not applied and Robert Lagon has.

16          JUDGE READLER:  And the lead plaintiff.  But

17  it's just sort of odd that -- it's just sort of odd

18  that even the lead plaintiff hasn't even applied for

19  voting restoration.

20          MR. SHERMAN:  Well, the Supreme Court has

21  made clear in City of Lakewood and every decision in

22  this line of cases going back to Lovell v. Griffin in

23  1938 that a person bringing a suit under the First

24  Amendment unfettered discretion doctrine doesn't --

25          JUDGE READLER:  I know, but you could --

1   couldn't you just apply and get rulings and then

2   challenge the rulings as opposed to this sort of odd

3   game about whether this is like a trade permit?

4          MR. SHERMAN:  Well, the --

5          JUDGE READLER:  Isn't that just easier?  I

6   mean, you've basically got (indiscernible) --

7          MR. SHERMAN:  We think the First Amendment

8   of -- sorry.  I didn't mean to speak over you.

9          JUDGE READLER:  Well, I mean, you got most

10  of the relief you wanted from the Governor, from the

11  grace of the Governor.  You have three people left.

12  Only one had even applied at the time when the case

13  was in the District Court, I think, and it feels like

14  -- rather than going through this procedural or

15  standing hurdle that we spent all of our time on,

16  they could all apply.  They could all get a ruling

17  from the Governor, and then if they don't like the

18  Governor's ruling, that maybe you have a substantive

19  constitutional challenge then.

20         MR. SHERMAN:   Well, with respect, we

21  strongly disagree, Your Honor.  We think that there

22  is a clear First Amendment violation here because --

23         JUDGE READLER:  Well, you don't disagree

24  with what I'm saying.  I mean, you disagree with the

25  procedure I laid out, which just, to me, seems

1   cleaner.  You can do whatever you want obviously, but

2   it seems to me there's a fairly clean route for doing

3   this.

4           MR. SHERMAN:  Well, that would only address

5   the three individual plaintiffs who are left, and

6   they have a facial challenge for the clear First

7   Amendment violation because of the lack of rules or

8   criteria in this(Indiscernible).

9           JUDGE READLER:  Well, you only have three --

10  my point is you only have three plaintiff's left.

11          JUDGE WHITE:  Counsel, if this is -- you

12  want to differentiate this from a pardon, but if this

13  is part of a pardon and your clients lose their

14  voting rights because of the conviction and the way

15  to get it restored if they are not in this automatic

16  group is to apply for a pardon.  And it's very clear

17  that the law permits a limit on voting for convicted

18  felons.  So why is this not a pardon case as opposed

19  to a First Amendment voting case?

20          MR. SHERMAN:  Well, they don't need to

21  obtain -- thank you, Your Honor.  They don't need to

22  obtain a pardon in order to regain the right to vote

23  in Kentucky.  What they need is voting rights

24  restoration, which is just one of the effects of the

25  pardon.  Indeed, here, it's a partial, partial pardon

1   because normally the application includes the right

2   to hold office, but all that's at issue in this case

3   is arbitrary restoration of the right to vote.

4          Now, the Kentucky law -- and we don't

5   challenge this -- can disenfranchise all of these

6   people permanently, but it has created an exception

7   to allow -- selectively allow people to regain the

8   right to vote.  Nothing turns on the state labels

9   that state law assigns to this issue, right.  They

10   could call it a pardon or a partial pardon, clemency

11   or not.  Forty states in the country are dealing with

12   this exact issue, voting rights restoration outside

13   of the clemency procedure.  There's nothing inherent

14   about voting rights restoration that makes it part of

15   a pardon or part of clemency.

16          JUDGE WHITE:  Okay.

17          JUDGE BOGGS:  Counsel, am I right --

18          JUDGE WHITE:  (Indiscernible) -- I'm sorry.

19   I was just -- go ahead.  Go ahead.

20          JUDGE BOGGS:  I just wanted to be clear that

21   your people, the two that applied, they've applied,

22   but there has been no ruling.  So in a sense, you

23   can't always complain about what the Governor denied

24   because he can just let it sit, which is what's

25   happening now; is that correct?

1          MR. SHERMAN:  That's correct, Judge Boggs.

2    Thank you for noting that because it is also the fact

3    that we have a second claim on the lack of reasonable

4    definite time limits, which is considered a species

5    of unbridled discretion.  And after you submit this

6    application, the Governor could hold the application

7    indefinitely.  And indeed Rob Langdon's petition for

8    restoration has been pending for over a year; I think

9    even it's close to two years.  So there's no

10   requirement that it be decided by any time.

11          And that is exactly why this case is in sync

12   with City of Lakewood.  The same concerns and

13   principles that obtained in that case, the risk of

14   viewpoint discrimination due to the lack of rules and

15   criteria, as well as the risk of unreviewability,

16   effective unreviewability because it's submitted into

17   a black box, and there's no way to challenge it

18   through an as-applied challenge at a later date.

19          I see that my time has elapsed.  So --

20          JUDGE WHITE:  Well, I'm sorry.  You're

21   saying there's no way to challenge it if it just sits

22   there, and there's no action?

23          MR. SHERMAN:  Your Honor, under City of

24   Lakewood, I'm referring also to the lack of an

25   ability to challenge it as applied because there are

Page 16

1    no standards.  There are no rules or criteria.  So --

2          JUDGE WHITE:  Well, but, I mean, one can

3    certainly imagine permitting a case where there is

4    viewpoint discrimination in the application, right.

5    I mean, if a governor only permits registered

6    Democrats and not registered Republicans, then I

7    would think that that would be a different case.

8          MR. SHERMAN:  But because it's completely

9    within the Governor's unfettered discretion, then

10   it's totally subjective and there's no requirement

11   for him to -- Governor Bashear to record his

12   reasoning for granting or denying applications,

13   there's no effective way to know what's happening in

14   this black box system.  So it is effectively

15   unreviewable, and there's no way to challenge it as

16   applied down the line.

17          There are a number of quotes from City of

18   Lakewood dealing with this.  Without standards to

19   fetter the licenser's discretion, the difficulties of

20   proof and the case-by-case nature of as-applied

21   challenges render the licenser's action in large

22   measure effectively unreviewable.  So that's what I

23   was speaking to, Your Honor.

24          JUDGE WHITE:  All right.  Thank you.

25          MR. SHERMAN:  Thank you, Your Honor.

Page 17

1          JUDGE READLER:  Any other questions from the

2  panel?

3          JUDGE BOGGS:  No.  I'm good.

4          JUDGE READLER:  All right.  You'll have your

5  rebuttal time.

6          MR. SHERMAN:  Thank you.

7          JUDGE READLER:  Mr. Payne?

8          MR. PAYNE:  Thank you, Your Honor.

9          Taylor Payne, Chief Deputy General Counsel

10  on behalf of the Governor and may it please the

11  Court.

12          It's clear from the District Court's order

13  that the ruling was on standing as opposed to

14  reaching the merits.  Where I think the plaintiffs

15  are wrong is that -- and it's suggesting that the

16  District Court sort of comingled a standings and

17  merits ruling -- is that ultimately the same reasons

18  for finding that the plaintiffs lack standing in this

19  case are also applicable to the merits had the Court

20  reached that -- had the Court reached the merits of

21  this decision.

22          But to begin, just to provide a little

23  background to the Court on the pardon power in

24  Kentucky, like many other states, convicted felons

25  lose their right to vote under Section 145 of the

1   Kentucky Constitution.  Such disenfranchisement has

2   been sanctioned by the United States Supreme Court as

3   being allowed under the Fourteenth Amendment, but

4   also, like in many other states, Kentucky allows the

5   Governor to issue a pardon that may nullify part of

6   that punishment of being convicted of a felony, one

7   of those punishments being losing your right to vote.

8   So ultimately --

9           JUDGE READLER:  Why hasn't the Governor done

10  this?  I mean, this one application has been waiting

11  -- and I thought it was maybe even longer than what

12  your friend on the other side said -- but one of

13  these applications has been sitting there for quite a

14  long time.

15          MR. PAYNE:  Well, I believe the plaintiff

16  suggested that one of the applications had been

17  pending with the Governor's Office for about a year.

18          JUDGE READLER:  Or two.  I thought it was

19  longer than a year.  I mean, one was just-- maybe

20  not.  But --

21          MR. PAYNE:  There may have been an

22  application submitted to prior governors, Your Honor,

23  but I'm not sure how long each of these -- the two

24  plaintiffs that have applied have potentially been

25  pending.

1          JUDGE READLER:  Okay.  Well, that's kind of

2     wild to me because this is like what the -- the case

3     is all about these three people.  Only two of them

4     applied, and you don't know when the two applied?

5     All right.  Let's assume it's two years.  And let's

6     assume, your friend on the other side, it's two

7     years.  You can't challenge that; I take it.  Why has

8     the Governor sat on one of these applications for two

9     years?

10          MR. PAYNE:  Well, I don't think it's a

11     matter of necessarily sitting on the application and

12     not taking any action.  I mean, the ultimate --

13          JUDGE READLER:  I mean, why has there not

14     been -- let me rephrase.  Why has there not been a

15     final determination on whether to grant the partial

16     pardon or not?

17          MR. PAYNE:  Well, I think ultimately that

18     would be the Governor has not made up his mind yet

19     whether to grant it or deny it.  So --

20          JUDGE READLER:  Well, the Governor took like

21     a month to grant clemency to like a whole bunch of

22     people, and it's taken him two years to consider this

23     one application?

24          MR. PAYNE:  Well, Your Honor, we have

25     ultimately thousands of applications that are

1   submitted to us.  We --

2           JUDGE READLER:  Well, do they always take

3   two years?

4           MR. PAYNE:  I don't think they always take

5   two years.  I think it's a very --

6           JUDGE READLER:  It just feels like you guys

7   could make this -- it just feels like you could make

8   this case to some degree go away by either granting

9   or denying the pardon.  If you grant it, then I think

10  your friend on the other side would be quite happy

11  with that, and at least one or two of these

12  individuals who applied would be able to vote.  If

13  you deny it, then maybe they have a separate

14  challenge about the basis for the denial.  But partly

15  due to your own inaction, we're sort of stuck in this

16  middle ground, where there's been an application, a

17  lawsuit, no decision.

18          MR. PAYNE:  Right.  I understand that, Your

19  Honor.  What I would say though is, you know, when

20  the Governor initially restored over 140,000 former

21  convicted felons -- or convicted felons' right to

22  vote, you know, that -- the District Court originally

23  held that is what -- that did moot this case.

24          Now, this Court reversed that, essentially

25  saying that EO didn't apply to these plaintiffs

Page 21

1   because ultimately it didn't -- what it didn't act as

2   was a denial for these plaintiffs.  But what's sort

3   of ironic or I think challenging for the plaintiffs

4   here is that is to their benefit that the Governor

5   retains their right to continually consider their

6   pardons.  I mean, one --

7           JUDGE READLER:  Well, it's not much of a

8   benefit if you never act on it.  I mean, it just --

9           MR. PAYNE:  Well --

10          JUDGE READLER:  -- it seems like -- I just

11  couldn't understand why you've taken this long.  It

12  would make the case either go away or crystalize, and

13  it's almost -- I mean, are you like -- are you like

14  wanting us to rule rather than you doing -- I mean,

15  this is really a -- this is really a direction to the

16  Governor.  This is the Governor's power.  It's a

17  state matter.  It almost feels like you're dragging

18  your feet so we'll rule one way or the other, but you

19  could make the case go away or, at least most of the

20  case go away.

21          MR. PAYNE:  Not at all, Your Honor.  And you

22  know, and I think, ultimately, that's just never been

23  a consideration of this office is to go ahead and

24  rule on these three so that this case would go away.

25          JUDGE READLER:  Well, I mean, you're the

Page 22

1  Governor's legal counsel.  I think usually legal --
2  at least in Ohio, the legal counsel are the one who
3  considers the pardons.  So I just -- it's just a
4  surprising fact to me, but I'll let you move on.
5         MR. PAYNE:  Well, thank you, Your Honor.
6         I think, you know, just to conclude that
7  point, I do think in many ways the Governor's
8  original action establishing executive order of his
9  parameters for automatic restoration -- I know this
10 Court disagreed that it mooted that case, but
11 ultimately what it did was the Governor made a
12 decision on that point as to what his criteria was
13 going to be.  If it would have been a denial to these
14 plaintiffs, I do think this case would have been
15 moot.  And I think this Court would have agreed with
16 the District Court at that time.
17        But again it remains to the plaintiffs'
18 benefit that the Governor can consider their
19 application in one period of time and rather than
20 saying it's a flat-out denial and I will never
21 consider your pardon again, that he's saying I'm not
22 granting it now when I'm granting these others, but I
23 retain the power to reconsider this in the future
24 should your conditions change, should you become a
25 more worthy applicant to this office for the use of

Page 23

1   that pardon power.

2         Again, back to the standing issue in this

3   case --

4         JUDGE WHITE:  Are there any criterion for

5   deciding which of those people who don't get it

6   automatically are worthy?

7         MR. PAYNE:  No, Your Honor.  Under Kentucky

8   law, that is left to each governor who holds the

9   office to ultimately subjectively determine what --

10  who they think is worthy --

11        JUDGE WHITE:  Oh.

12        MR. PAYNE:  -- of that --

13        JUDGE WHITE:  Yeah.  I'm just curious.

14        MR. PAYNE:  -- clemency.

15        JUDGE WHITE:  Does the Governor claim there

16  are criteria?

17        MR. PAYNE:  No.  But this Governor did

18  establish criteria early in his term that applied to

19  the convicted -- disenfranchised, convicted felons.

20        JUDGE WHITE:  Well, when you say he

21  established that, are you talking about the order

22  that says when you can automatically be restored?

23        MR. PAYNE:  Yes.  It was an executive order

24  early in the --

25        JUDGE WHITE:  Okay.

Page 24

1          MR. PAYNE:  -- first few days of the

2     administration.

3          JUDGE WHITE:  So I wasn't asking about that.

4     I mean, like you referred to a candidate as not

5     worthy now but maybe worthy in the future.  Is there

6     any internal definition of worthy?

7          MR. PAYNE:  No, Your Honor.  And, Your

8     Honor, I think that's something that, for each

9     governor in any state, they would consider.  So they

10    potentially have criteria of what they're looking for

11    in an applicant that they think warrants the use of

12    this extraordinary power.

13          JUDGE WHITE:  Okay.

14          MR. PAYNE:  And for an applicant who, you

15    know, someone that it's -- this is just a

16    hypothetical example here, but whether that's hours

17    of community service logged or something to that

18    effect, an applicant, you know, two years in has a

19    much better chance of demonstrating that community

20    service than if it was required to be decided within

21    a month or a certain time frame of the governor

22    receiving that application.

23          And applicants are welcome to routinely

24    update this office as to --

25          JUDGE WHITE:  So how do we know --

Page 25

1          MR. PAYNE:  -- their worthiness.

2          JUDGE WHITE:  -- let's say -- would you

3     agree that if the Governor were granting these

4     limited pardons on an impermissible basis, that would

5     be unconstitutional?

6          MR. PAYNE:  Not necessarily, Your Honor, but

7     I would concede that Justices of the Supreme Court

8     have recognized -- I don't believe a majority has

9     ever said this -- that the use of the pardon power to

10    -- could in some ways be in violation of the Equal

11    Protection Clause.

12          But again that's not the case here.  There's

13    been no allegation that that's ever been used in

14    Kentucky to infringe on anyone's First Amendment

15    rights, let alone their Equal Protection rights.  But

16    I do think --

17          JUDGE WHITE:  So how would --

18          MR. PAYNE:  -- there are --

19          JUDGE WHITE:  -- how would one go about

20    finding out if that's the case or establishing that

21    that's the case if it is the case?

22          MR. PAYNE:  Well, I think what a plaintiff

23    could do is look at a governor's entire history of

24    pardons.  Obviously, they would have to engage in

25    discovery and attempt to learn about what the

1    motivations were and the intent of the pardons.  It

2    would be a difficult case, Your Honor, but the

3    Supreme Court has, I think, in some ways suggested

4    the pardon power, after its use, could be challenged

5    under those terms.

6              I think, you know, in another situation,

7    certainly the pardon power, to the extent it was used

8    to grant political favors or something like that,

9    there could be potentially the criminal system, I

10   think, could be involved in providing a check on the

11   Governor's power there.

12             JUDGE WHITE:  Well --

13             MR. PAYNE:  What the (indiscernible) would

14   be --

15             JUDGE WHITE:  How do you respond to the

16   black box argument?

17             MR. PAYNE:  Well, you know, I mean, that is

18   -- the Supreme Court has essentially said that the

19   types of procedural processes that the plaintiffs are

20   asking here -- certainly, they said this in the Equal

21   Protection claim -- there is no right to a timeliness

22   on the decision, and there is no right to impose

23   outside procedural protections on these applications

24   once they are received.

25             The Supreme Court has held essentially a

1    governor never has to act on a pardon -- on a pardon

2    application, and largely, that is because, especially

3    with the right to vote, these convicted felons have

4    lost that right.  They no longer have an interest in

5    their right to vote.  This Court and the Supreme

6    Court have said once you are constitutionally

7    disenfranchised from the exercise of that vote, this

8    Court -- that there is no fundamental right left to

9    assert by the plaintiffs.

10           And I would just briefly -- I believe the

11   time has stopped on my computer.  So I don't know how

12   much time I have left.  It's started --

13           JUDGE READLER:  I think it stopped here -- I

14   think it's stopped for both sides.  So we're just

15   being very generous today.

16           MR. PAYNE:  Oh, okay.  Thank you, Your

17   Honor.

18           You know, I would just briefly in closing

19   like to address the licensing cases that the

20   plaintiff has admitted, conceded, that would require

21   this Court to adopt that reasoning.  As the District

22   Court correctly held, they're wholly different

23   animals that we're discussing here.  The District

24   Court essentially looked at it in just what is a

25   license and what is a pardon.  A license is obviously

Page 28

1    granting permission to someone to exercise a right

2    that they already have, whereas a pardon is a

3    retroactive application nullifying a punishment.

4            But here again, as I've said before, the

5    plaintiffs have lost any fundamental or

6    constitutional right that may exist under the First

7    Amendment or under the Equal Protection Clause -- I

8    understand these are only First Amendment claims --

9    but they've lost any constitutional or fundamental

10   right to assert.  Therefore, there is no -- there is

11   no process of the Governor licensing them to exercise

12   those rights.  They are gone.

13           But the bigger problem with the comparison

14   to the licensing cases it those hinge completely on

15   the ordinance being challenged being a prior

16   restraint on the expression of the individual seeking

17   the license and the threat, the risk that those

18   seeking the license will self-censor their own speech

19   going forward.

20           So in the City of Lakewood case, it was an

21   annual permit in order to allow media outlets to

22   publish their newspapers and put them in certain news

23   racks around the city.  The Court held that that

24   hypothetical risk of having a license denied was

25   enough of an actual injury to allow the plaintiffs

1    standing to assert a facial challenge in that case

2    because of the prior restraint's risk of self-

3    censorship.

4              So ultimately, what they're saying is the

5    mayor of the city, the city council, could monitor

6    the expression of a newspaper, ultimately decide they

7    didn't like a negative article written about the

8    council or the mayor, and then deny them the ability

9    to put that in news racks throughout the city, deny

10   them a license to do that.

11             The risk there is that the media outlet then

12   will not run the critical story on the mayor or the

13   local government in hopes that that won't deter the

14   city or the mayor from granting their right to

15   publish in the future.

16             But none of those issues are present in the

17   case of a pardon.  Here, the pardon power is not what

18   is the prior restraint.  The prior restraint, if

19   anything, if it is a restraint on the free expression

20   of speech, is their convicted felony.  It's the

21   Kentucky Constitution that deprives them of their

22   right to vote the moment they become convicted

23   felons.  Again, that power has been upheld time and

24   time again by the Supreme Court as constitutional.

25             But again the self-censorship is not even

Page 30

1   here. Plaintiffs have lost their right to vote.

2   They can't self-censor their right to vote while

3   their pardon is pending before the Governor. So none

4   of the same issues of why the Supreme Court allows a

5   facial challenge to these licensing schemes exists in

6   the context of the use of the pardon power.

7          So again, because of that, the District

8   Court ultimately found the plaintiffs' lacked

9   standing. Those arguments would also be applicable

10   to the merits should the Court reach that decision.

11          If there are no other questions, Your

12   Honors, we will wrap up.

13          JUDGE READLER: Any questions from the

14   panel?

15          JUDGE WHITE: No. Thank you.

16          JUDGE READLER: Okay. Thank you, Mr. Payne.

17          Mr. Sherman, you have three minutes,

18   depending on whether we stop the clock or not,

19   perhaps more.

20          MR. SHERMAN: Thank you, Your Honor.

21          Well, this Court has heard it directly from

22   Governor Bashear's counsel. That's as clear an

23   unfettered discretion violation as this Court is

24   likely to ever see. A person submits an application

25   to engage in political expression once again, and the

6/22/2023        Deric Lostutter, et al. v. Commonwealth of Kentucky, et al.        Audio Transcription

Page 31

1    Governor will decide whether they are "worthy."

2    There are no rules, no criteria, admittedly, and

3    there is no specific content whatsoever to that

4    determination.  Just one single official with sole

5    and exclusive authority to determine whether that

6    person is worthy or not.

7             JUDGE BOGGS:  (Indiscernible), counsel?  I

8    mean, you know, we have 500 years of history about

9    clemency and pardon powers on things that are,

10   frankly, more important than voting.  Voting is very

11   important, but being left in prison -- you know,

12   think about, you know, the famous case of Debs, the

13   socialist candidate for president, who stayed in

14   prison because Woodrow Wilson didn't like him.  And

15   when Harding came in, although he had his problems,

16   he was perfectly happy to let Debs out with no

17   criteria.  I mean, isn't -- what you really have is a

18   complete attack on the history of the pardon power?

19            MR. SHERMAN:  We think not, Your Honor, but

20   we're not talking about physical liberty here.  We're

21   talking about a First Amendment --

22            JUDGE BOGGS:  But I'm saying --

23            MR. SHERMAN:  -- protected right.

24            JUDGE BOGGS:  -- isn't that -- isn't that

25   even worse?  Think about Debs, a candidate

1    (indiscernible), who's right to be out campaigning is

2    in the sole discretion of the people that may be his

3    opponents.

4         MR. SHERMAN:  We think not, Your Honor.  The

5    First Amendment, as enjoyed at the Supreme Court, the

6    highest protection.  That's the reason that the First

7    Amendment unfettered discretion doctrine operates as

8    sort of a vaccination or an inoculation against

9    viewpoint discrimination, and unlike with the

10   Fourteenth Amendment, where you need to prove that

11   discrimination has already occurred, here, you can

12   bring a facial challenge.

13        I think a number of the questions today have

14   suggested implicitly that our clients are only able

15   to bring as-applied challenges but that's not so

16   under Forsyth County and many of these other cases,

17   City of Lakewood, a facial challenge is available.

18   Forsyth County, for its part, says facial attacks on

19   the discretion granted to decision maker are not

20   dependent on the facts surrounding any particular

21   permit decision.  The success of that facial

22   challenge rests not on whether the administrator had

23   said --

24        JUDGE READLER:  But this is a First

25   Amendment -- this is a case of chill under the First

Page 33

1   Amendment, right.  It's a First Amendment case?

2           MR. SHERMAN:  Correct, Your Honor.  Right.

3           JUDGE READLER:  Okay.  Yeah.  So I mean, the

4   whole ball of wax is whether this is actually a First

5   Amendment question that you're raising.

6           So suppose, I mean, we were thinking about

7   other possibilities.  Once you're a felon, you're

8   disenfranchised of other rights.  One, say, is jury

9   service.  I mean, if we think voting is -- if we

10  think voting is expressive, why isn't serving on a

11  jury also expressive in some ways?  And that means

12  that you could -- we could also have a facial

13  challenge to the prohibition on serving on juries.

14  And I don't know what the other ramifications are of

15  being a felon, but this feels like a bit of a

16  slippery slope.

17          MR. SHERMAN:  With respect, we disagree,

18  Your Honor.  There's no precedent whatsoever

19  suggesting that serving on a jury in any way

20  implicates the First Amendment, where there is

21  decades and decades, 85 years here going back, at

22  least for voting, going back to Williams v. Rhodes in

23  1968 suggesting -- saying that voters have expressive

24  First Amendment interest in casting their ballots.

25          I'd note also going back to the political

Page 34

1  expression question, in the aggregate, voting is

2  communicative.  It speaks.  Even if it's a secret

3  ballot, those voters communicate by the people they

4  vote for, the candidates they vote for, the parties

5  they vote for, and also the causes they vote for

6  through ballot initiatives.  I do want to --

7        JUDGE READLER:  I think your time is up, but

8  does anyone else have any questions?

9        Okay.  If you have one last point you want

10 to make, go ahead.

11       MR. SHERMAN:  I did want to just really

12 quickly address the purported functional differences.

13 Voting rights restoration is what the District Court

14 should have been comparing to licensing, not pardons

15 as a whole.  Pardons are not at issue here.  We're

16 not attacking the pardon power.  We're simply trying

17 to constrain voting rights restoration, which is

18 being dealt with arbitrarily, and the three purported

19 differences that this is a one-time act of clemency.

20 It's not.  There could be repeating counters if

21 voting rights restoration is denied one or more

22 times.  Revocability, there's no authority in the

23 First Amendment law that revocability is an

24 indispensable feature for licensing and, three, this

25 notion of retrospective effect, right.  Voting rights

Page 35

1    has no retrospective effect.  It's all prospective.

2    You can't get back the elections you missed.  You can

3    only have license to vote in the future.

4              JUDGE READLER:  Great.  Thank you.

5              Unless there's other questions, we've been

6    generous with our time.  Thank you to both of you for

7    your arguments, and we will take the case under

8    consideration.

9              (END OF AUDIO RECORDING)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 36

1                    CERTIFICATE OF TRANSCRIPTIONIST

2               I certify that the foregoing is a true and

3     accurate transcript of the digital recording provided

4     to me in this matter.

5               I do further certify that I am neither a

6     relative, nor employee, nor attorney of any of the

7     parties to this action, and that I am not financially

8     interested in the action.

9

10

11

12     _____

13                    Julie Thompson, CET-1036

14

15

16

17

18

19

20

21

22

23

24

25

6/22/2023 Deric Lostutter, et al. v. Commonwealth of Kentucky, et al. Audio Transcription

Page 1

**A**

ability 15:25 29:8
able 7:22,23
 20:12 32:14
accept 9:22
accessing 7:20
accurate 36:3
act 21:1,8 27:1
 34:19
action 15:22
 16:21 19:12
 22:8 36:7,8
activity 8:4
actual 28:25
address 3:23
 13:4 27:19
 34:12
addressed 4:21
administration
 24:2
administrative
 6:15,19
administrator
 32:22
admitted 27:20
admittedly 31:2
adopt 27:21
aggregate 7:22
 34:1
ago 4:10
agree 25:3
agreed 22:15
ahead 14:19,19
 21:23 34:10
al 1:2,6 3:3,4
 11:11
allegation 25:13
allow 14:7,7
 28:21,25
allowed 18:3
allows 18:4 30:4
altogether 4:20
Aman 11:11
Amendment 3:16
 4:7 5:8,10 6:8
 7:1,4,5,20 8:3,9
 8:10 10:7 11:24

12:7,22 13:7,19
 18:3 25:14 28:7
 28:8 31:21 32:5
 32:7,10,25 33:1
 33:1,5,20,24
 34:23
analysis 3:14
 6:15,18
Anderson 7:17
 8:6
animals 27:23
annual 28:21
anonymity 9:11
anonymous 9:16
 9:18
anti-selfie 9:5
anyone's 25:14
APPEARANC...
 2:1
appellants 1:3
 3:5,11
applicable 17:19
 30:9
applicant 22:25
 24:11,14,18
applicants 24:23
application 3:17
 5:21 6:21 14:1
 15:6,6 16:4
 18:10,22 19:11
 19:23 20:16
 22:19 24:22
 27:2 28:3 30:24
applications
 16:12 18:13,16
 19:8,25 26:23
applied 3:14 6:18
 10:24,25 11:11
 11:13,15,18
 12:12 14:21,21
 15:25 16:16
 18:24 19:4,4
 20:12 23:18
apply 6:9,14 12:1
 12:16 13:16
 20:25
applying 5:18

approach 6:10,11
arbitrarily 34:18
arbitrary 14:3
argument 1:13
 3:4 4:16 9:21
 26:16
arguments 30:9
 35:7
article 29:7
as-applied 15:18
 16:20 32:15
asking 24:3
 26:20
assert 27:9 28:10
 29:1
assigned 9:6
assigns 14:9
association 7:9
 7:10,13
assume 19:5,6
assure 4:25
attack 31:18
attacking 34:16
attacks 32:18
attempt 25:25
attorney 36:6
AUDIO 1:12
 35:9
authority 31:5
 34:22
automatic 13:15
 22:9
automatically
 23:6,22
available 32:17
Avenue 2:18

**B**

back 9:20 10:22
 10:23 11:22
 23:2 33:21,22
 33:25 35:2
background
 17:23
backtracked
 3:21 10:15
ball 33:4

ballot 7:21 8:2,3
 8:18,21,23 9:3
 9:5 34:3,6
ballots 33:24
ban 9:13
Bashear 16:11
Bashear's 30:22
basically 12:6
basis 20:14 25:4
behalf 2:8,15
 17:10
believe 6:9,17
 9:25 10:3,7,13
 18:15 25:8
 27:10
Bell 3:25 4:20
 10:13
bench 4:22
benefit 21:4,8
 22:18
Beshear 4:16
best 7:25 8:6
better 3:25 24:19
bigger 28:13
bit 33:15
black 15:17
 16:14 26:16
Boggs 2:5 9:2,8
 9:18 10:9,17
 14:17,20 15:1
 17:3 31:7,22,24
Bonifacio 11:11
box 8:2 15:17
 16:14 26:16
brief 4:19
briefly 27:10,18
bring 5:25 6:1
 32:12,15
bringing 11:23
bunch 19:21

**C**

call 11:6 14:10
calls 6:17
campaigning
 32:1
candidate 8:23

24:4 31:13,25
candidates 7:19
 7:24 34:4
Capitol 2:10
case 1:2 3:2,21
 4:6,7,9 5:1,12
 6:17 7:25 8:16
 9:12,17 12:12
 13:18,19 14:2
 15:11,13 16:3,7
 17:19 19:2 20:8
 20:23 21:12,19
 21:20,24 22:10
 22:14 23:3
 25:12,20,21,21
 26:2 28:20 29:1
 29:17 31:12
 32:25 33:1 35:7
case-by-case
 16:20
cases 5:6 6:14,16
 7:7,17 8:7,7,21
 8:25 11:22
 27:19 28:14
 32:16
casting 8:17,19
 9:3 33:24
causes 34:5
Celebrezze 7:18
censorship 29:3
CENTER 2:9
certain 24:21
 28:22
certainly 16:3
 26:7,20
CERTIFICATE
 36:1
certify 36:2,5
CET-1036 36:13
CHAD 2:6
challenge 5:17,17
 6:1,2 12:2,19
 13:6 14:5 15:17
 15:18,21,25
 16:15 19:7
 20:14 29:1 30:5
 32:12,17,22

6/22/2023    Deric Lostutter, et al. v. Commonwealth of Kentucky, et al.   Audio Transcription

Page 2

33:13
challenged 26:4
  28:15
challenges 10:21
  16:21 32:15
challenging 21:3
chance 24:19
change 22:24
character 8:15
characterizing
  6:4
check 8:3 26:10
Chief 17:9
chill 32:25
CHKRS 4:10
Cincinnati 5:7
CIRCUIT 2:4,5
  2:6
Citizens 3:25
city 5:7,19 6:14
  11:21 15:12,23
  16:17 28:20,23
  29:5,5,9,14
  32:17
claim 4:13,14
  7:15 15:3 23:15
  26:21
claims 3:20 4:7
  4:16 28:8
Clause 25:11
  28:7
clean 13:2
cleaner 13:1
clear 7:18 8:22
  11:21 12:22
  13:6,16 14:20
  17:12 30:22
clemency 14:10
  14:13,15 19:21
  23:14 31:9
  34:19
clients 5:2,2
  10:24 13:13
  32:14
clock 30:18
close 15:9
closing 27:18

comes 9:4
comingled 17:16
Commission 9:10
Commonwealth
  1:5 3:3
communicate
  34:3
communicative
  34:2
community
  24:17,19
Company 3:24
  4:19,20 10:13
comparing 34:14
comparison
  28:13
complain 14:23
complaint 3:13
complete 6:25
  31:18
completely 16:8
  28:14
computer 27:11
concede 25:7
conceded 27:20
conceive 6:3
concerns 15:12
conclude 22:6
conditions 22:24
conduct 5:10 7:2
  7:4,8
conflated 3:15
consider 19:22
  21:5 22:18,21
  24:9
consideration
  21:23 35:8
considered 15:4
considers 22:3
consistent 6:12
Constitution
  18:1 29:21
constitutional
  3:19 12:19 28:6
  28:9 29:24
constitutionally
  27:6

constrain 5:11
  34:17
contains 5:10
content 8:18 9:12
  31:3
context 30:6
continually 21:5
convicted 13:17
  17:24 18:6
  20:21,21 23:19
  23:19 27:3
  29:20,22
conviction 13:14
correct 3:7 7:14
  7:14 8:24 14:25
  15:1 33:2
Corrections 6:22
correctly 27:22
council 29:5,8
counsel 4:24 9:2
  13:11 14:17
  17:9 22:1,2
  30:22 31:7
counters 34:20
country 14:11
County 32:16,18
course 8:9
court 3:11,12,14
  3:20 4:1,3,6,10
  4:15 5:16,16
  6:12 7:7 9:13
  10:1,1,3,6,14
  10:15 11:20
  12:13 17:11,16
  17:19,20,23
  18:2 20:22,24
  22:10,15,16
  25:7 26:3,18,25
  27:5,6,8,21,22
  27:24 28:23
  29:24 30:4,8,10
  30:21,23 32:5
  34:13
Court's 5:5,6
  6:11 8:11,12
  10:20 17:12
Courts 11:4

created 6:16,19
  14:6
criminal 26:9
criteria 5:11,15
  13:8 15:15 16:1
  22:12 23:16,18
  24:10 31:2,17
criterion 23:4
critical 29:12
crystalize 21:12
curious 23:13

―――――――――

D

D.C 1:24 2:12
DANNY 2:5
date 15:18
days 24:1
deal 8:7
dealing 8:8 14:11
  16:18
dealt 34:18
Debs 31:12,16,25
decades 33:21,21
decide 4:4 29:6
  31:1
decided 4:2
  10:10 15:10
  24:20
deciding 3:16
  23:5
decision 8:12
  11:21 17:21
  20:17 22:12
  26:22 30:10
  32:19,21
decisions 10:20
DEFENDANT
  2:15
Defendants 1:7
definite 15:4
definition 24:6
degree 20:8
Democrats 16:6
demonstrating
  24:19
denial 20:14 21:2
  22:13,20

denied 5:19
  14:23 28:24
  34:21
deny 7:1 19:19
  20:13 29:8,9
denying 16:12
  20:9
Department 6:22
dependent 32:20
depending 30:18
depends 6:4
deprives 29:21
Deputy 17:9
Deric 1:2 3:2
  11:14
deter 29:13
determination
  4:5,8 19:15
  31:4
determine 23:9
  31:5
difference 11:6
differences 34:12
  34:19
different 7:12,13
  16:7 27:22
differentiate
  13:12
difficult 26:2
difficulties 16:19
digital 1:23 36:3
direction 21:15
directly 30:21
disagree 12:21
  12:23,24 33:17
disagreed 22:10
discovery 25:25
discretion 3:17
  5:8,11 6:8,25
  10:8 11:24 15:5
  16:9,19 30:23
  32:2,7,19
discrimination
  5:24 15:14 16:4
  32:9,11
discussing 27:23
disenfranchise

6/22/2023    Deric Lostutter, et al. v. Commonwealth of Kentucky, et al.  Audio Transcription

Page 3

14:5
**disenfranchised** 23:19 27:7 33:8
**disenfranchise...** 18:1
**dismissed** 4:9,13
**dismissing** 3:13
**disposed** 3:21
**dispositive** 5:21
**dispute** 11:1
**distinct** 8:23
**district** 3:12,14 4:15 6:10 10:1 12:13 17:12,16 20:22 22:16 27:21,23 30:7 34:13
**doctrine** 3:17 5:9 6:9 11:24 32:7
**Doe** 8:12,14
**doing** 13:2 21:14
**dragging** 21:17
**due** 15:14 20:15

—————— **E** ——————
**early** 23:18,24
**easier** 12:5
**effect** 8:13,17 24:18 34:25 35:1
**effective** 15:16 16:13
**effectively** 10:15 16:14,22
**effects** 11:2 13:24
**either** 9:23 20:8 21:12
**elapsed** 15:19
**elections** 2:9 9:10 35:2
**eligibility** 6:23
**employee** 36:6
**engage** 7:1 25:24 30:25
**enjoyed** 32:5
**entire** 25:23
**Environment**

3:25
**EO** 20:25
**Equal** 25:10,15 26:20 28:7
**erroneously** 3:15
**error** 3:23 4:22
**errors** 3:12
**especially** 27:2
**ESQUIRE** 2:10 2:17
**essentially** 10:2 20:24 26:18,25 27:24
**establish** 23:18
**established** 23:21
**establishing** 22:8 25:20
**et** 1:2,6 3:3,3
**EVIDENCE** 1:23
**exact** 14:12
**exactly** 15:11
**example** 24:16
**exceed** 3:4
**exception** 4:18 14:6
**exclusive** 31:5
**executive** 22:8 23:23
**exercise** 27:7 28:1,11
**exist** 28:6
**exists** 30:5
**express** 7:23
**expression** 7:8,16 8:14 28:16 29:6 29:19 30:25 34:1
**expressive** 5:10 7:2,4,8,21 8:15 8:18 9:4,7,12 33:10,11,23
**extent** 26:7
**extraordinary** 24:12

—————— **F** ——————
**facial** 5:17 6:1

10:21 13:6 29:1 30:5 32:12,17 32:18,21 33:12
**facially** 5:17,25
**fact** 8:13 9:5 15:2 22:4
**facts** 5:20 32:20
**failure** 4:14
**FAIR** 2:9
**fairly** 8:22 13:2
**fall** 4:18
**famous** 31:12
**fascial** 5:25
**favor** 9:23
**favors** 26:8
**feature** 34:24
**feels** 12:13 20:6,7 21:17 33:15
**feet** 21:18
**felon** 33:7,15
**felons** 13:18 17:24 20:21 23:19 27:3 29:23
**felons'** 20:21
**felony** 18:6 29:20
**fetter** 16:19
**fettered** 5:8
**final** 19:15
**financially** 36:7
**finding** 17:18 25:20
**first** 3:13,16,23 4:7 5:8,9,18 6:8 6:21 7:1,3,20 8:3,8,10 10:2,7 11:23 12:7,22 13:6,19 24:1 25:14 28:6,8 31:21 32:5,6,24 32:25 33:1,4,20 33:24 34:23
**flat-out** 22:20
**foregoing** 36:2
**formalistic** 3:14 6:11
**formally** 8:2

**former** 20:20
**Forsyth** 32:16,18
**Forty** 14:11
**forward** 9:23 28:19
**found** 4:10 30:8
**Fourteen** 7:5
**Fourteenth** 8:9 18:3 32:10
**frame** 24:21
**Frankfort** 2:19
**frankly** 31:10
**free** 29:19
**Frick** 6:13
**friend** 18:12 19:6 20:10
**frivolous** 4:17
**functional** 6:9,14 6:18 34:12
**Functionally** 5:13
**fundamental** 27:8 28:5,9
**further** 36:5
**future** 22:23 24:5 29:15 35:3

—————— **G** ——————
**game** 12:3
**General** 17:9
**generous** 27:15 35:6
**getting** 8:21,23
**given** 10:4
**go** 8:2 10:22,22 14:19,19 20:8 21:12,19,20,23 21:24 25:19 34:10
**going** 9:22 11:22 12:14 22:13 28:19 33:21,22 33:25
**good** 17:3
**governed** 7:4
**governing** 5:9
**government**

29:13
**governor** 2:16 4:15 12:10,11 12:17 14:23 15:6 16:5,11 17:10 18:5,9 19:8,18,20 20:20 21:4,16 22:11,18 23:8 23:15,17 24:9 24:21 25:3 27:1 28:11 30:3,22 31:1
**governor's** 4:19 6:24,24 12:18 16:9 18:17 21:16 22:1,7 25:23 26:11
**governors** 18:22
**grace** 12:1
**grant** 6:25 19:15 19:19,21 20:9 26:8
**granted** 32:19
**granting** 16:12 20:8 22:22,22 25:3 28:1 29:14
**Great** 35:4
**Griffin** 11:22
**ground** 20:16
**grounds** 3:22
**group** 1:23 13:16
**guess** 10:23
**guys** 20:6

—————— **H** ——————
**happening** 14:25 16:13
**happy** 20:10 31:16
**Harding** 31:15
**heard** 30:21
**held** 20:23 26:25 27:22 28:23
**HELENE** 2:4
**highest** 32:6
**highly** 3:14

6/22/2023     Deric Lostutter, et al. v. Commonwealth of Kentucky, et al.   Audio Transcription

Page 4

**history** 25:23
  31:8,18
**hold** 14:2 15:6
**holding** 10:19
**holds** 23:8
**Honor** 3:8,10 5:5
  6:7 7:14 8:24
  9:25 10:12
  12:21 13:21
  15:23 16:23,25
  17:8 18:22
  19:24 20:19
  21:21 22:5 23:7
  24:7,8 25:6
  26:2 27:17
  30:20 31:19
  32:4 33:2,18
**Honors** 30:12
**Hood** 4:1,20
  10:13
**hopes** 29:13
**hours** 24:16
**hurdle** 12:15
**hypothetical**
  24:16 28:24

**I**

**ignores** 4:19
**imagine** 16:3
**immaterial** 4:17
**impermissible**
  4:3,11 25:4
**impermissibly**
  3:21
**implicates** 33:20
**implicitly** 32:14
**important** 31:10
  31:11
**impose** 26:22
**improper** 10:11
**inaction** 20:15
**includes** 14:1
**indefinitely** 15:7
**indiscernible** 9:1
  9:15 11:6,14
  12:6 14:18
  26:13 31:7 32:1

**indispensable**
  34:24
**individual** 5:20
  13:5 28:16
**individual's** 8:22
**individually** 7:22
**individuals** 20:12
**infringe** 25:14
**inherent** 14:13
**initially** 20:20
**initiatives** 34:6
**injury** 28:25
**inoculation** 32:8
**instruct** 10:13
**insubstantial**
  4:17
**intent** 26:1
**interest** 7:20,21
  27:4 33:24
**interested** 36:8
**internal** 24:6
**intertwined** 4:3
**involved** 26:10
**ironic** 21:3
**issue** 10:23 14:2
  14:9,12 18:5
  23:2 34:15
**issues** 29:16 30:4

**J**

**J** 2:5
**Jon** 3:11
**JONATHAN**
  2:10,13
**Judge** 2:4,5,6 3:2
  3:9 4:24 6:3 7:3
  7:10,12,25 8:20
  9:1,2,8,14,18
  10:9,17,22 11:7
  11:12,16,25
  12:5,9,23 13:9
  13:11 14:16,17
  14:18,20 15:1
  15:20 16:2,24
  17:1,3,4,7 18:9
  18:18 19:1,13
  19:20 20:2,6

21:7,10,25 23:4
  23:11,13,15,20
  23:25 24:3,13
  24:25 25:2,17
  25:19 26:12,15
  27:13 30:13,15
  30:16 31:7,22
  31:24 32:24
  33:3 34:7 35:4
**JUDGES** 2:3
**Julie** 36:13
**JUNE** 1:14 3:1
**juries** 33:13
**jurisdiction** 3:23
**jurisdictional**
  3:22 4:5,21
**jury** 33:8,11,19
**just--** 18:19
**Justices** 25:7

**K**

**K** 2:11
**Kentucky** 1:5
  2:16,19 3:3
  11:4,4 13:23
  14:4 17:24 18:1
  18:4 23:7 25:14
  29:21
**Kentucky's** 5:13
**kind** 19:1
**knew** 9:19
**know** 8:1 11:25
  16:13 19:4
  20:19,22 21:22
  22:6,9 24:15,18
  24:25 26:6,17
  27:11,18 31:8
  31:11,12 33:14
**knows** 9:4

**L**

**labeled** 11:5
**labels** 14:8
**lack** 4:8,9,13
  10:18 13:7 15:3
  15:14,24 17:18
**lacked** 30:8

**Lagon** 11:15
**laid** 12:25
**Lakewood** 5:19
  11:21 15:12,24
  16:18 28:20
  32:17
**Langdon's** 15:7
**large** 16:21
**largely** 27:2
**law** 9:6 11:4
  13:17 14:4,9
  23:8 34:23
**laws** 5:23 9:6
**lawsuit** 20:17
**lead** 11:16,18
**learn** 25:25
**left** 12:11 13:5,10
  23:8 27:8,12
  31:11
**legal** 8:13,17 22:1
  22:1,2
**let's** 10:22,22
  19:5,5 25:2
**liberty** 31:20
**license** 6:5 27:25
  27:25 28:17,18
  28:24 29:10
  35:3
**licenser's** 16:19
  16:21
**licensing** 5:9,14
  6:19 27:19
  28:11,14 30:5
  34:14,24
**limit** 13:17
**limited** 25:4
**limits** 15:4
**linchpin** 5:22
**line** 8:6 11:22
  16:16
**little** 17:22
**local** 29:13
**logged** 24:17
**long** 18:14,23
  21:11
**longer** 18:11,19
  27:4

**look** 25:23
**looked** 27:24
**looking** 24:10
**lose** 13:13 17:25
**losing** 18:7
**lost** 4:13 10:10
  27:4 28:5,9
  30:1
**Lostutter** 1:2 3:3
  11:12,15
**lot** 8:7
**Lovell** 11:22

**M**

**M** 1:24
**majority** 25:8
**maker** 32:19
**matter** 19:11
  21:17 36:4
**mayor** 29:5,8,12
  29:14
**McIntyre** 9:10
**mean** 7:11,13 9:2
  12:6,8,9,24
  16:2,5 18:10,19
  19:12,13 21:6,8
  21:13,14,25
  24:4 26:17 31:8
  31:17 33:3,6,9
**means** 7:8 33:11
**measure** 16:22
**media** 5:6 28:21
  29:11
**merits** 3:20 4:2,4
  4:4,7 9:24 10:2
  10:4,5,6,7,10
  10:14,19 17:14
  17:17,19,20
  30:10
**middle** 20:16
**Miller** 5:7
**mind** 19:18
**minutes** 3:4,6
  30:17
**missed** 35:2
**moment** 29:22
**monitor** 29:5

6/22/2023     Deric Lostutter, et al. v. Commonwealth of Kentucky, et al.   Audio Transcription

Page 5

month 19:21
  24:21
moot 20:23 22:15
mooted 22:10
motivations 26:1
move 22:4

**N**

N 2:4
narrow 4:18
nature 16:20
necessarily 4:6
  19:11 25:6
need 6:7 13:20,21
  13:23 32:10
needs 6:10
negate 8:14,18
  9:11
negative 29:7
neither 4:15 36:5
never 21:8,22
  22:20 27:1
news 28:22 29:9
newspaper 29:6
newspapers
  28:22
normally 14:1
Norman 7:17 8:5
note 33:25
noting 15:2
notion 34:25
Novak 6:13
nullify 18:5
nullifying 28:3
number 3:2
  16:17 32:13
numerous 7:6,17
  8:25
NW 1:24 2:11

**O**

obtain 13:21,22
obtained 15:13
obviously 4:24
  10:9 11:1 13:1
  25:24 27:25
occurred 32:11

odd 11:17,17
  12:2
office 2:16 6:24
  6:24 14:2 18:17
  21:23 22:25
  23:9 24:24
official 5:11 31:4
Oh 23:11 27:16
Ohio 9:10 22:2
Ohio's 9:13
okay 3:9 9:20
  14:16 19:1
  23:25 24:13
  27:16 30:16
  33:3 34:9
once 10:4 26:24
  27:6 30:25 33:7
one-time 34:19
operates 5:14
  32:7
opponents 32:3
opposed 12:2
  13:18 17:13
Oral 1:13 3:4
order 6:8,16 10:3
  13:22 17:12
  22:8 23:21,23
  28:21
ordinance 5:23
  28:15
original 22:8
originally 20:22
Ostergren 6:13
outlet 29:11
outlets 28:21
outside 14:12
  26:23

**P**

pamphlets 9:16
panel 2:3 17:2
  30:14
paragraph 10:2
parameters 22:9
pardon 10:24
  11:3,3 13:12,13
  13:16,18,22,25

13:25 14:10,10
  14:15 17:23
  18:5 19:16 20:9
  22:21 23:1 25:9
  26:4,7 27:1,1
  27:25 28:2
  29:17,17 30:3,6
  31:9,18 34:16
pardons 3:16
  21:6 22:3 25:4
  25:24 26:1
  34:14,15
Parma 6:14
part 13:13 14:14
  14:15 18:5
  32:18
partial 13:25,25
  14:10 19:15
particular 4:23
  9:3 32:20
parties 7:24 34:4
  36:7
parties' 7:20
partly 20:14
pashed 6:22
Payne 2:17 17:7
  17:8,9 18:15,21
  19:10,17,24
  20:4,18 21:9,21
  22:5 23:7,12,14
  23:17,23 24:1,7
  24:14 25:1,6,18
  25:22 26:13,17
  27:16 30:16
pending 15:8
  18:17,25 30:3
people 9:19
  12:11 14:6,7,21
  19:3,22 23:5
  32:2 34:3
perfectly 31:16
period 22:19
permanently
  14:6
permissible 10:6
permission 7:1
  28:1

permit 5:19,20
  12:3 28:21
  32:21
permits 13:17
  16:5
permitting 16:3
person 11:23
  30:24 31:6
petition 8:15,20
  15:7
petitions 9:15,15
phonetic 11:11
physical 31:20
plaintiff 2:8 4:12
  6:20 11:16,18
  18:15 25:22
  27:20
plaintiff's 5:17
  5:25 13:10
plaintiffs 6:20
  13:5 17:14,18
  18:24 20:25
  21:2,3 22:14
  26:19 27:9 28:5
  28:25 30:1
plaintiffs' 3:13
  3:20 22:17 30:8
please 3:11 17:10
point 4:23 8:11
  9:9 13:10 22:7
  22:12 34:9
political 7:9,16
  7:19 8:13 26:8
  30:25 33:25
possibilities 33:7
potentially 18:24
  24:10 26:9
power 17:23
  21:16 22:23
  23:1 24:12 25:9
  26:4,7,11 29:17
  29:23 30:6
  31:18 34:16
powers 31:9
precedent 5:5,6
  33:18
precedents 4:1

preference 7:23
present 29:16
president 31:13
prevents 5:23
Prime 5:6
principles 15:13
prior 6:16 18:22
  28:15 29:2,18
  29:18
prison 31:11,14
problem 9:22
  28:13
problems 31:15
procedural 12:14
  26:19,23
procedurally
  9:21 10:11
procedure 12:25
  14:13
proceeding 8:9
process 28:11
processes 26:19
prohibition
  33:13
proof 16:20
prospective 35:1
protected 5:10
  7:2,7,15 8:3
  31:23
protection 25:11
  25:15 26:21
  28:7 32:6
protections 26:23
prove 32:10
provide 17:22
provided 36:3
providing 26:10
publish 28:22
  29:15
punishment 18:6
  28:3
punishments
  18:7
purported 34:12
  34:18
put 28:22 29:9

6/22/2023    Deric Lostutter, et al. v. Commonwealth of Kentucky, et al.   Audio Transcription

Page 6

## Q

question 6:6,15
  9:10 33:5 34:1
questions 4:22
  17:1 30:11,13
  32:13 34:8 35:5
quickly 3:24
  34:12
quite 18:13 20:10
quotes 16:17

## R

racks 28:23 29:9
raising 33:5
ramifications
  33:14
reach 4:4 10:6,14
  30:10
reached 3:19 4:6
  17:20,20
reaching 17:14
READLER 2:6
  3:2,9 4:24 7:3
  7:10,12,25 8:20
  9:1,14 10:22
  11:7,12,16,25
  12:5,9,23 13:9
  17:1,4,7 18:9
  18:18 19:1,13
  19:20 20:2,6
  21:7,10,25
  27:13 30:13,16
  32:24 33:3 34:7
  35:4
really 5:22 21:15
  21:15 31:17
  34:11
reason 32:6
reasonable 15:3
reasoning 16:12
  27:21
reasons 17:17
rebuttal 3:6 17:5
recast 4:4,8
received 26:24
receiving 24:22
recognized 25:8

reconsider 22:23
record 16:11
recording 1:12
  35:9 36:3
Reed 7:17 8:5,12
  8:14
referred 6:23
  24:4
referring 15:24
regain 13:22 14:7
regarding 10:21
registered 16:5,6
rehearsed 10:20
relative 36:6
relevant 5:21
relief 12:10
remaining 5:2
remains 22:17
render 16:21
repeating 34:20
rephrase 19:14
Republicans 16:6
require 27:20
required 6:20
  24:20
requirement
  15:10 16:10
respect 12:20
  33:17
respond 26:15
response 9:9
restoration 3:15
  5:14 11:1,2,19
  13:24 14:3,12
  14:14 15:8 22:9
  34:13,17,21
restored 13:15
  20:20 23:22
restraint 6:16
  28:16 29:18,18
  29:19
restraint's 29:2
rests 32:22
retain 22:23
retains 21:5
retroactive 28:3
retrospective

34:25 35:1
reversed 20:24
revocability
  34:22,23
Rhodes 7:18
  33:22
right 5:4 8:1,2,12
  8:16 9:11,15
  13:22 14:1,3,8
  14:9,17 16:4,24
  17:4,25 18:7
  19:5 20:18,21
  21:5 26:21,22
  27:3,4,5,8 28:1
  28:6,10 29:14
  29:22 30:1,2
  31:23 32:1 33:1
  33:2 34:25
rights 3:15 5:13
  11:1,2 13:14,23
  14:12,14 25:15
  25:15 28:12
  33:8 34:13,17
  34:21,25
risk 15:13,15
  28:17,24 29:2
  29:11
Rob 15:7
Robert 11:15
route 13:2
routinely 24:23
rule 4:12 21:14
  21:18,24
ruled 10:2
rules 5:11,15
  13:7 15:14 16:1
  31:2
ruling 4:5 9:23
  10:4,5 12:16,18
  14:22 17:13,17
rulings 6:12 12:1
  12:2
run 29:12

## S

sanctioned 18:2
sat 19:8

Save 3:6
saying 9:19 12:24
  15:21 20:25
  22:20,21 29:4
  31:22 33:23
says 8:1,1 23:22
  32:18
scheme 5:9,14,18
  6:4,19
schemes 30:5
se 5:7
second 3:19 11:7
  11:10 15:3
secret 34:2
Section 17:25
see 15:19 30:24
seeking 28:16,18
selectively 14:7
self- 29:2
self-censor 28:18
  30:2
self-censorship
  29:25
SENIOR 2:4,5
sense 14:22
separate 20:13
service 24:17,20
  33:9
serving 33:10,13
  33:19
Sherman 2:10,13
  3:5,7,10,11 5:4
  6:6 7:6,11,14
  8:5,24 9:8,16
  9:25 10:12,18
  10:25 11:10,14
  11:20 12:4,7,20
  13:4,20 15:1,23
  16:8,25 17:6
  30:17,20 31:19
  31:23 32:4 33:2
  33:17 34:11
side 3:4 18:12
  19:6 20:10
sides 27:14
signature 8:20
signatures 8:16

Similarly 8:16
simply 34:16
single 31:4
sit 14:24
sits 15:21
sitting 18:13
  19:11
situation 26:6
slippery 33:16
slope 33:16
socialist 31:13
sole 31:4 32:2
somebody 9:19
sorry 9:14 12:8
  14:18 15:20
sort 11:17,17
  12:2 17:16
  20:15 21:2 32:8
speak 12:8
speaking 16:23
speaks 34:2
species 15:4
specific 31:3
speech 9:11,12
  9:18 28:18
  29:20
spent 12:15
split 11:5
stage 5:1
standards 16:1
  16:18
standing 4:2,9,9
  4:14,25 5:3,7
  6:1 9:21 10:18
  10:23 12:15
  17:13,18 23:2
  29:1 30:9
standings 17:16
started 27:12
state 4:14 11:4
  14:8,9 21:17
  24:9
states 14:11
  17:24 18:2,4
statute 5:23 11:5
stayed 31:13
Steel 3:24 4:18

6/22/2023　　Deric Lostutter, et al. v. Commonwealth of Kentucky, et al.　Audio Transcription

Page 7

4:20 10:13
**step** 9:20
**sticking** 7:16
**stop** 30:18
**stopped** 27:11,13
　27:14
**story** 29:12
**Street** 1:24 2:11
**strongly** 12:21
**struck** 9:13
**stuck** 20:15
**subjective** 16:10
**subjectively** 23:9
**submit** 6:21 15:5
**submits** 30:24
**submitted** 15:16
　18:22 20:1
**substantive**
　12:18
**success** 32:21
**suggested** 18:16
　26:3 32:14
**suggesting** 17:15
　33:19,23
**suit** 11:23
**Suite** 1:24 2:11
　2:18
**suppose** 33:6
**Supreme** 4:1 5:5
　5:16 7:7 8:12
　9:13 10:20
　11:20 18:2 25:7
　26:3,18,25 27:5
　29:24 30:4 32:5
**sure** 9:6 18:23
**surprising** 22:4
**surrounding**
　32:20
**sync** 15:11
**system** 5:14
　16:14 26:9

**T**

**take** 9:20 19:7
　20:2,4 35:7
**taken** 6:10 19:22
　21:11

**talking** 23:21
　31:20,21
**Taylor** 2:17 17:9
**term** 23:18
**terms** 26:5
**thank** 3:10 5:4
　9:8 10:17 13:21
　15:2 16:24,25
　17:6,8 22:5
　27:16 30:15,16
　30:20 35:4,6
**things** 9:9 31:9
**think** 3:24 10:5
　12:7,13,21 15:8
　16:7 17:14
　19:10,17 20:4,5
　20:9 21:3,22
　22:1,6,7,14,15
　23:10 24:8,11
　25:16,22 26:3,6
　26:10 27:13,14
　31:12,19,25
　32:4,13 33:9,10
　34:7
**thinking** 33:6
**this(Indiscerni...**
　13:8
**Thompson** 36:13
**thought** 11:8
　18:11,18
**thousands** 19:25
**threat** 28:17
**three** 3:6 5:2
　10:24 12:11
　13:5,9,10 19:3
　21:24 30:17
　34:18,24
**threshold** 6:6,23
**time** 4:12 12:12
　12:15 15:4,10
　15:19 17:5
　18:14 22:16,19
　24:21 27:11,12
　29:23,24 34:7
　35:6
**timeliness** 26:21
**times** 34:22

**today** 27:15
　32:13
**totally** 16:10
**trade** 12:3
**transcript** 36:3
**TRANSCRIPT...**
　1:12
**TRANSCRIPT...**
　36:1
**tried** 11:5
**true** 36:2
**trying** 34:16
**turns** 14:8
**two** 3:12 4:10 9:9
　10:25 14:21
　15:9 18:18,23
　19:3,4,5,6,8,22
　20:3,5,11 24:18
**types** 26:19

**U**

**ultimate** 19:12
**ultimately** 17:17
　18:8 19:17,25
　21:1,22 22:11
　23:9 29:4,6
　30:8
**unbridled** 15:5
**unconstitutional**
　25:5
**understand**
　20:18 21:11
　28:8
**unfettered** 3:17
　6:8,25 10:8
　11:24 16:9
　30:23 32:7
**United** 18:2
**unreviewability**
　15:15,16
**unreviewable**
　16:15,22
**update** 24:24
**upheld** 29:23
**use** 22:25 24:11
　25:9 26:4 30:6
**usually** 22:1

**V**

**v** 3:25 4:20 5:7
　6:13,13 7:17,17
　7:18 8:5,12,14
　9:10 10:13
　11:22 33:22
**vaccination** 32:8
**verdict** 8:6
**versus** 3:3,25
**view** 10:11
**viewpoint** 5:24
　15:14 16:4 32:9
**violation** 12:22
　13:7 25:10
　30:23
**vote** 8:2,19 13:22
　14:3,8 17:25
　18:7 20:12,22
　27:3,5,7 29:22
　30:1,2 34:4,4,5
　34:5 35:3
**voters** 33:23 34:3
**voters'** 7:21
**voting** 3:15 5:13
　7:2,3,7 8:1,7,17
　8:22 9:7 11:1,2
　11:19 13:14,17
　13:19,23 14:12
　14:14 31:10,10
　33:9,10,22 34:1
　34:13,17,21,25
**vs** 1:4

**W**

**waiting** 18:10
**want** 10:9 13:1
　13:12 34:6,9,11
**wanted** 12:10
　14:20
**wanting** 21:14
**wants** 9:6
**warrants** 24:11
**Washington** 1:24
　2:12
**wasn't** 24:3
**wax** 33:4
**way** 13:14 15:17

15:21 16:13,15
　21:18 33:19
**ways** 22:7 25:10
　26:3 33:11
**we'll** 21:18
**we're** 8:9 20:15
　27:14,23 31:20
　31:20 34:15,16
**we've** 10:19 35:5
**welcome** 24:23
**whatsoever** 5:15
　31:3 33:18
**WHITE** 2:4 6:3
　13:11 14:16,18
　15:20 16:2,24
　23:4,11,13,15
　23:20,25 24:3
　24:13,25 25:2
　25:17,19 26:12
　26:15 30:15
**wholly** 4:16
　27:22
**wild** 19:2
**Williams** 7:18
　33:22
**Wilson** 31:14
**win** 6:7 10:10
**Woodrow** 31:14
**worse** 31:25
**worthiness** 25:1
**worthy** 22:25
　23:6,10 24:5,5
　24:6 31:1,6
**wouldn't** 10:11
**wrap** 30:12
**written** 29:7
**wrong** 17:15

**X**

**Y**

**Yeah** 23:13 33:3
**year** 15:8 18:17
　18:19
**years** 4:10 15:9
　19:5,7,9,22
　20:3,5 24:18

6/22/2023    Deric Lostutter, et al. v. Commonwealth of Kentucky, et al.  Audio Transcription

Page 8

31:8 33:21

**Z**

**0**

**1**
**100** 2:18
**140,000** 20:20
**145** 17:25
**15** 3:4
**1730** 1:24
**1825** 2:11
**1938** 11:23
**1968** 33:23

**2**
**20006** 2:12
**20036** 1:24
**202** 1:25
**2021** 6:13
**2023** 1:14 3:1
**22** 1:14 3:1
**22-5703** 1:2 3:2
**232-0646** 1:25

**3**

**4**
**40601** 2:19
**450** 2:11

**5**
**500** 31:8

**6**

**7**
**700** 2:18

**8**
**812** 1:24
**85** 33:21